**REESE LLP**
Michael R. Reese (SBN 206773)
Sue J. Nam (SBN 206729)
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email: *mreese@reesellp.com*
          *snam@reesellp.com*

**REESE LLP**
Charles D. Moore (admitted *pro hac vice*)
121 N. Washington Ave., 4th Floor
Minneapolis, MN 55401
Telephone: 212-643-0500
Fax: 212-253-4272
Email: *cmoore@reesellp.com*

**REESE LLP**
George V. Granade (SBN 316050)
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile  (212) 253-4272
Email: *ggranade@reesellp.com*

*Counsel for Plaintiffs*
*and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONIECE DRAKE, DEBORAH BOWLING, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>BAYER HEALTHCARE LLC,<br><br>                              Defendant. | Case No. 3:22-cv-01085-MMA-JLB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs DONIECE DRAKE, DEBORAH BOWLING (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## SUMMARY OF THE ACTION

1.    This action seeks to remedy the deceptive and misleading business practices of Bayer Healthcare LLC (hereinafter "Defendant") with respect to the marketing and sales of Defendant's One a Day Natural Fruit Bites products[1] that represent that they are natural ("Products").

2.    Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e., that its Products are natural; however, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain non-natural, synthetic ingredients.

3.    Plaintiffs and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are natural when purchasing the Products. Plaintiffs and Class Members paid a premium for the Products based upon their natural representation. Given that Plaintiffs and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are natural, Plaintiffs and Class Members suffered an injury in the amount of the premium paid.

4.    Defendant's conduct violated and continues to violate, *inter alia*, California Consumers Legal Remedies Act ("CLRA"), California Civil Code section 1750 et al, as well as New York General Business Law ("GBL") §§ 349 and 350. Accordingly, Plaintiffs bring this action against Defendant on behalf of themselves

---

[1] The Products come in four varieties: Men's, Women's, Men's 50+, and Women's 50+. All make the "natural" claim.

and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d) in that: (1) this is a class action involving more than 100 class members; (2) Plaintiff Bowling is a citizen of the State of California, Defendant Bayer Healthcare is a citizen of the States of Delaware and New Jersey, and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

6.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contract to supply goods within the State of California, and supply goods within the State of California, including the Products.

7.     Venue is proper because a substantial part of the events or omissions giving rise to the classes' claims occurred in this District.

## PARTIES

8.     Plaintiff Drake is a citizen of New York, residing in Queens, New York. Plaintiff Drake purchased the product from retail outlets in Queens, New York, during the class period.

9.     Plaintiff Drake purchased the Product because she believed the Product was natural based on the representations on the principal display panel of the Product. The packaging of the Product Plaintiff Drake purchased contained the representation that it was natural. Plaintiff Drake believes that products that are labeled as natural do not contain synthetic ingredients. Plaintiff Drake believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources. Plaintiff Drake remains in the market for natural

vitamins, and continues to shop at retail locations where the Products are sold. If the Products did not contain unnatural ingredients, Plaintiff Drake would purchase the Product again in the immediate future. If the Court were to issue an injunction ordering Defendant to comply with the state and federal laws, and prohibiting Defendant's use of the deceptive practices discussed herein, Plaintiff Drake would likely purchase the Products again in the near future. At present, however, Plaintiff Drake cannot be confident that the labeling of the Products is, and will be, truthful and non-misleading. As a result, Plaintiff Drake cannot rely on the labels of the Products.

10.     Had Defendant not made the false, misleading, and deceptive representation that the Products were natural, Plaintiff Drake would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products. Plaintiff Drake purchased, purchased more of and/or paid more for, the Products than she would have had she known the truth about the Products. The Product Plaintiff Drake received was worth less than the Product for which she paid.  Plaintiff Drake was injured in fact and lost money as a result of Defendant's improper conduct.

11.     Plaintiff Bowling is a citizen of California, residing in Riverside County, California. Plaintiff Bowling purchased the product from retail outlets in Los Angeles County, California, during the class period.

12.     Plaintiff Bowling purchased the Product because she believed the Product was natural based on the representations on the principal display panel of the Product. The packaging of the Product Plaintiff Bowling purchased contained the representation that it was natural. Plaintiff Bowling believes that products that are labeled as natural do not contain synthetic ingredients. Plaintiff Bowling believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring

plant, animal, or mineral sources. Plaintiff Bowling remains in the market for natural vitamins, and continues to shop at retail locations where the Products are sold. If the Products did not contain unnatural ingredients, Plaintiff Bowling would purchase the Product again in the immediate future. If the Court were to issue an injunction ordering Defendant to comply with the state and federal laws, and prohibiting Defendant's use of the deceptive practices discussed herein, Plaintiff Bowling would likely purchase the Products again in the near future. At present, however, Plaintiff Bowling cannot be confident that the labeling of the Products is, and will be, truthful and non-misleading. As a result, Plaintiff Bowling cannot rely on the labels of the Products.

13.     Had Defendant not made the false, misleading, and deceptive representation that the Products were natural, Plaintiff Bowling would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products. Plaintiff Bowling purchased, purchased more of and/or paid more for, the Products than she would have had she known the truth about the Products. The Product Plaintiff Bowling received was worth less than the Product for which she paid.  Plaintiff Bowling was injured in fact and lost money as a result of Defendant's improper conduct.

14.     Defendant Bayer Healthcare LLC is a limited liability company with its principal place of business in Whippany, New Jersey.  Defendant manufactures, markets, advertises, and distributes the Products throughout the United States, including in the District. Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

15.     Defendant manufactures, markets, advertises and sells vitamins, including the Products, one or more of which were purchased by Plaintiffs and members of the proposed Class. Defendant manufactured, marketed, advertised,

distributed and sold its Products widely throughout the State of California and the Southern District of California during the Class Period.

16.    On information and belief, in committing the wrongful acts alleged herein, Defendant, in connection with its subsidiaries, affiliates, and/or other related entities and their employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Products by means of false, misleading, deceptive and fraudulent acts and omissions.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.    Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.  Companies such as Defendant, have capitalized on consumers' desire for purportedly "natural products."  Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients.  In 2015, sales of natural products grew 9.5% to $180 billion.[2]  Reasonable consumers, including Plaintiffs

---

[2] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR,    http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NTWORK (December 20, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

18. Despite the Products containing a number of synthetic ingredients, Defendant markets the Products as being natural. Below are the Products' labeling at issue:

 

1
2
3
4
5
6
7
8
9
10
11
12
13

 

14    19.    Defendant's representations that the Products are natural, are false,

15 misleading, and deceptive because all the Products contain same ingredients that are,

16 as explained below, synthetic.

17        a.  **Cholecalciferol** (9,10-seco(5Z,7E,)-5,7,10(19)-cholestatrien-3-ol) is a

18            synthetic substance. It is manufactured by ultraviolet irradiation of 7-

19            dehydrocholesterol produced from cholesterol. *See* 21 C.F.R. §

20            184.1950(a)(2). It is then purified by crystallization. *Id.*

21        b.  **Niacinamide** (3-pyridinecarboxylic acid amide)[3] is a synthetic

22            substance. Niacinamide, as known as nicotinamide,[4] is manufactured

23

24 _____

25 [3] *See* 21 C.F.R. § 184.1535.

26 [4] Nat'l Ctr. for Biotechnology Info., U.S. Dep't of Health & Human Servs.,
27 *Open    Chemistry    Database:    Nicotinamide:    4.2.    Synonyms*
   PubChem.NCBI.NLM.NIH.gov .

28

in several ways, each of which is a chemical process that chemically changes substances into niacinamide:[5]

    i.    2-Methylglutaronitrile, a byproduct of adiponitrile production, is converted to 2-methyl-1,5-diaminopentane. Cyclic hydrogenation gives 3-methylpiperidine. Dehydrogenation yields 3-methylpyridine, which is then ammoxidated and partly hydrolyzed to nicotinamide;

    ii.    In a multitubular reactor 3-methylpyridine, air, ammonia, and hydrogen react at ca. 350 °C and moderate pressure to give 3-cyanopyridine. Heterogeneous catalysts containing oxides of antimony, vanadium, and titanium, antimony, vanadium, and uranium or antimony-vanadium-titanium catalyst are highly effective. For instance, with a vanadium, titanium, zirconium, molybdenum catalyst, a reactor temperature of 340 °C, and a molar feed ratio of 3-methylpyridine: ammonia: oxygen of 1:1.3:40 yields 95% of 3-cyanopyridine. 3-Cyanopyridine is converted to nicotinamide by alkaline hydrolysis. This reaction has the advantage that saponification to the amide is fast compared to total hydrolysis to nicotinic acid. The hydrolysis to the amide is normally carried out with catalytic amounts of bases, mainly sodium hydroxide, at 130-150 °C;

---

[5] *Id.* at *10.2 Methods of Manufacture*.

   iii.  In the Lonza process, 3-cyanopyridine is converted to nicotinamide by means of an immobilized microorganism of the genus Rhodococcus. Heterogeneous catalysts are also mentioned. A copper-chromium oxide catalyst, manganese dioxide, or manganese dioxide with chromium-nickel oxide, chromium-cobalt oxide, or manganese dioxide with titanium-silicon dioxide give good yields of nicotinamide; or

   iv.  Nicotinic acid is melted and reacted with ammonia gas to yield nicotinamide. The reaction is catalyzed by the presence of ammonium salts. After distillation, nicotinamide is dissolved in water, purified by the addition of activated carbon, filtered, recrystallized and centrifuged. The nicotinamide contained in the mother liquor is reclaimed by a special recovery operation. The wet pure nicotinamide filter cake is dried under vacuum in a rotary vacuum drier.

  c. **Pyridoxine hydrochloride** (3-hydroxy-4,5-dihydroxymethy-2-methylpyridine hydrochloride) is prepared by chemical synthesis[6], and is therefore synthetic substance. Pyridoxine hydrochloride is manufactured in several ways, each of which is a chemical process that chemically changes substances into pyridoxine hydrochloride:[7]

---

[6] 21 C.F.R. § 184.1676.

[7] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Pyridoxine hydrochloride: 10.2 Methods of Manufacture* PUBCHEM.NCBI.NLM.NIH.GOV.

  i.  Synthesis by condensation of cyanoacetamide & ethoxyacetylacetone;

  ii.  Synthesis from 2-butanon-1,4-diol & alpha-methyliminopropionitrile; or

  iii.  Synthesis from ethyl pyruvate, ethyl glycinate, and 1,4-diethoxy-2-butanone.

d. **D-biotin** is a synthetic substance. Di-biotin, as known as biotin,[8] is manufactured in several ways, each of which is a chemical process that chemically changes substances into niacinamide:[9]

  i.  The Hoffman-La Roche industrial synthesis of biotin starts with fumaric acid. The sequence of bromination, replacement of dibromide with benzyl-bromide, and ring closure with phosgene gives the imidazole cis-dicarboxylic acid. The corresponding anhydride is opened with cyclohexanol to the racemic monoester which is resolved with (+)-ephedrine in high yield. The enantiomer is recycled back to the anhydride. Lithium borohydride reduces only the ester group of (+)-ephedrine, thus producing the lactone with the desired absolute configuration. Sulfur is then introduced by treatment with potassium thioacetate to give the thiolactone. The side chain is introduced in two phases. The first three carbons are attached by a Grignard

---

[8] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Biotin: 2.4.2. Depositor-Supplied Synonyms* PUBCHEM.NCBI.NLM.NIH.GOV .

[9] *Id.* at *10.2 Methods of Manufacture*.

reaction. Dehydration and hydrogenation over Raney nickel establishes the third chiral center stereospecifically. The last two carbons are then added by reaction of the cyclic sulfonium cation with sodium dimethylmalonate. Hydrolysis of the ester groups of decarboxylation, and didebenzylation occur during heating with aqueous HBr to produce the optically pure biotin in a more than 25% overall yield;

ii.    Sumitomo produces biotin by an efficient asymmetric conversion of the prochiral cis-acid to the optically active lactone. The acid reacts with the optically active dihydroxy amine to give quantitatively the chiral imide. Sodium borohydride reduces stereoselectively the pro-R carbonyl group to give, after recrystallization, the optically pure hydroxy amide. Hydrolysis then yields the lactone; or

iii.    The stereocontrolled formation of all chiral centers of biotin can be achieved in three syntheses by means of 1,3-dipolar nitrone-olefin cycloadditions and in two syntheses by (2+2) cycloaddition methods.

e.    **Potassium iodide** is prepared by reacting hydriodic acid with potassium biocarbonate,[10] and is therefore a synthetic substance.

---

[10] 21 C.F.R. § 184.1634.

Other methods of manufacturing include a chemical process that chemically changes substances into potassium iodide:[11]

    i.    Prepared from HI and KHCO3. Purification by melting in dry hydrogen ... Continuous electrolytic process for large scale industrial preparation;

    ii.    A hot aqueous solution of potassium hydroxide is treated with iodine ... to form mixture of KI & potassium iodate. Solution is concentrated by heating ... then an excess of powdered charcoal is added ... Mixture is evaporated to dryness, then ignited. Charcoal ... reduces iodate to iodide and all of the iodine is thus obtained as potassium iodide;

    iii.    Prepared by first forming ferrosoferric iodide through reaction between iron wire and iodine in presence of water. A solution of pure potassium carbonate ... added until solution is faintly alkaline, boiled for few moments, and filtered; filtrate is concentrated and set aside to crystallize. KI ... is crystallized from an alkaline solution;

    iv.    Most USA production involves absorption of iodine in KOH. Approximately 80 wt % of the potassium iodate ... crystallizes from the reaction mixture and is separated for sale. Of the remainder, 90 wt % is removed by evaporation, fusion, and heating to about 600 °C.

---

[11] Nat'l Ctr. for Biotechnology Info., U.S. Dep't of Health & Human Servs., *Open Chemistry Database: Potassium iodide: 10.2 Methods of Manufacture* Pubchem.NCBI.NLM.NIH.gov.

The iodate is a poison /and/ ... must be completely removed frequently by a final reduction with carbon. After re-solution in water, further purification is carried out before recrystallization. Iron, barium, carbonate, and hydrogen sulfide are used to effect precipitation of sulfates and heavy metals; or

v.    Made by (1) Reaction of HI & KCl, followed by distillation of HCl, (2) Reaction of iodine with KOH or K2CO3 in solution, (3) Reaction of ferrous/ferric iodide with K2CO3, and (4) Evaporation of natural brines.

20.    Whether Defendant's labeling of the Products as natural is deceptive is judged by whether it would deceive or mislead a reasonable person. To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

21.    In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural). In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.

22.    Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources . . . ." 7 U.S.C. § 6502 (21).

23.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label. This is because the ingredient list does not disclose the manufacturing process for each ingredient. As the citations in paragraph 7 make clear, it takes dedicated research of the scientific, manufacturing, and regulatory literature to ascertain the manufacturing process for each ingredient, and thereby ascertain whether the ingredient is a synthetic substance.

24.    Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that the everyday knowledge of the average consumer. This is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients list, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

25.    Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent claims and representations that the Products are natural.

26.    Defendant did not disclose that the above listed ingredients are synthetic ingredients.  A reasonable consumer understands Defendant's natural claims to mean that the Products are natural and do not contain synthetic ingredients.

27.    Defendant has thus violated, *inter alia*,  NY General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label or other thing, containing or covering such an article, or with which such an article

is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article, which to its knowledge is falsely described or indicated upon any such package, or vessel containing the same, or label thereupon, in any of the particulars specified.

28.     Consumers rely on label representations and information in making purchasing decisions.

29.     The marketing of the Products as natural in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that natural claims are material to consumers.

30.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

31.     Plaintiffs and the Class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

32.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiffs and the Class members.

33.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled as being natural over comparable products not so labeled.

34.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiffs and the Class members in that they:

a.     Paid a sum of money for Products that were not what

Defendant represented;

    b.    Paid a premium price for Products that were not what Defendant represented;

    c.    Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

    d.    Ingested a substance that was of a different quality than what Defendant promised; and

    e.    Were denied the benefit of the beneficial properties of the natural supplements Defendant promised.

35.    Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class members would not have been willing to pay the same amount for the Products they purchased.

36.    Plaintiffs and the Class members paid for Products that are natural but received Products that are not natural. The Products Plaintiffs and the Class members received were worth less than the Products for which they paid.

37.    Plaintiffs and the Class members all paid money for the Products; however, Plaintiffs and the Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiffs and the Class members purchased, purchased more of, and/or paid more for the Products than they would have had they known the truth about the Products. Consequently, Plaintiffs and the Class members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

38.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seeks to represent the following classes defined as follows:

1    All consumers within the State of California who purchased the

2    Products from May 13, 2019 through the date of entry of class

3    certification for their personal use, rather than for resale or

4    distribution.  Excluded from the Class are Defendant's current or

5    former officers, directors, and employees; counsel for Plaintiffs

6    and Defendant; and the judicial officer to whom this lawsuit is

7    assigned.

8  ("California Class"); and

9    All consumers within the State of New York who purchased the

10    Products from May 31, 2020 through the date of entry of class

11    certification for their personal use, rather than for resale or

12    distribution.  Excluded from the Class are Defendant's current or

13    former officers, directors, and employees; counsel for Plaintiffs

14    and Defendant; and the judicial officer to whom this lawsuit is

15    assigned.

16  ("New York Class");

17  (New York Class and California Class collectively the "Class").

18    39.    The requirements of Federal Rule of Civil Procedure 23 are satisfied

19  because:

20    A.    Numerosity: The members of the class are so numerous that

21  joinder of all members is impracticable.  While the exact number of class members

22  is presently unknown to Plaintiffs, based on Defendant's volume of sales, Plaintiffs

23  estimate that it is in the thousands.

24    B.    Commonality: There are questions of law and fact that are

25  common to the class members and that predominate over individual questions.

26  These include the following:

27

28

     i. Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

     ii. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

     iii. Whether Defendant made false and/or misleading statements to the Class and the public concerning the contents of its Products;

     iv. Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public; and

     v. Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

    C.    Typicality: Plaintiffs' claims are typical of the claims of the class members because Plaintiffs suffered the same injury as the class members—*i.e.*, Plaintiffs purchased the Products based on Defendant's misleading misrepresentations, omissions, and non-disclosures that the were natural, when in fact they contained synthetic ingredients.

    D.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the members of each class. Plaintiffs do not have any interests that are adverse to those of the class members. Plaintiffs have retained competent counsel experienced in class action litigation and intend to prosecute this action vigorously.

    E.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of effort and expense that numerous individual actions would engender. Since the damages suffered by individual class members are relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged, while an important public interest will be served by addressing the matter as a class action.

40.    The prerequisites for maintaining a class action for injunctive or equitable relief under Federal Rule of Civil Procedure 23(b)(2) are met because Defendant had acted or refused to act on grounds generally applicable to each class, thereby making appropriate final injunctive or equitable relief with respect to each class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the Consumers Legal Remedies Act
### California Civ. Code § 1750 *et seq*.
### (On Behalf of the California Class)

41.    Plaintiffs incorporates by reference the allegations set forth above.

42.    Plaintiff Bowling and the California Class members is a "consumer" under the California Consumers Legal Remedies Act ("CLRA"), California Civil Code section 1761(d).

43.    The Products are "goods" under California Civil Code section 1761(a).

44.    The purchases by Plaintiff Bowling and the California Class members of the Products are "transactions" under California Civil Code section 1761(e).

45.    Under section 1770 of the CLRA:

> (a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> *    *    *    *    *
>
> (5) Representing that goods or services have sponsorship,

approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

\* \* \* \* \*

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

\* \* \* \* \*

(9) Advertising goods or services with intent not to sell them as advertised.

\* \* \* \* \*

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.* § 1770.

46.     As alleged above, Defendant violated, and continues to violate, Civil Code section 1770(a)(5) by representing the Products have characteristics, uses, benefits, and qualities which they do not. Specifically, Defendant represents the Products are natural, when, in fact, the Products contained unnatural ingredients.

47.     Further, as alleged above, Defendant violated, and continues to violate, Civil Code section 1770(a)(7) by representing the Products are of a particular standard or quality when they are of another. Specifically, Defendant represents the Products are natural, when, in fact, the Products contained unnatural ingredients.

48.     Further, as alleged above, Defendant violated, and continues to violate, Civil Code section 1770(a)(9) by advertising the Products are natural, when, in fact, the Products contained unnatural ingredients.

49.     Finally, as alleged above, Defendant violated, and continues to violate, Civil Code section 1770(a)(16) by representing that the Products it sold Plaintiff Bowling and the California Class members are natural, when, in fact, they are not.

50.     Plaintiff Bowling and the California Class members believed the Products were natural based on the Products' label. Plaintiff Bowling and the California Class members would not purchase the Products, but for Defendant's misleading misrepresentations, omissions, and non-disclosures.

51.     Plaintiff Bowling and the California Class members are injured in fact and lose money as a result of Defendant's conduct. Plaintiff Bowling and the California Class members pay for Products that are natural but do not receive such Products because the Products contained unnatural ingredients.

52.     On information and belief, Defendant's actions were willful, wanton, and fraudulent.

53.     On information and belief, officers, directors, or managing agents at Defendant authorized the use of the misleading statements about the Products.

54.     On May 13, 2022, Plaintiff Bowling sent a letter to Defendant pursuant to Cal. Civ. Code §1782 that provided Defendant notice of the misconduct and requested that Defendant cure its misconduct within 30 days (the "CLRA Notice").

55.     Defendant has not corrected or remedied the unlawful conduct after receiving the CLRA Notice, and Defendant continues to engage therein.

56.     Pursuant to Civil Code sections 1780 and 1782, Plaintiff Bowling and California Class members seek an injunction to bar Defendant from continuing their deceptive advertising practices, and reasonable attorneys' fees and costs.

57.     In addition to injunctive relief, Plaintiff Bowling seek damages for Defendant's violation of the CLRA.

**SECOND CAUSE OF ACTION**
**Violation of the New York GBL § 349**
**(On Behalf of the New York Class)**

58.    Plaintiff Drake incorporates by reference the allegations set forth above.

59.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

60.    The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff Drake and the New York Class Members seek monetary damages and the entry of preliminary against Defendant.

61.    Defendant misleadingly, inaccurately, and deceptively advertises and markets its Products to consumers.

62.    Defendant's improper consumer-oriented conduct—including labeling and advertising the Products as being natural —is misleading in a material way in that it, *inter alia*, induced Plaintiff Drake and the New York Class Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

63.    Plaintiff Drake and the New York Class Members have been injured inasmuch as they paid a premium for products that were—contrary to Defendant's representations— not natural.  Accordingly, Plaintiff Drake and the New York Class Members received less than what they bargained and/or paid for.

64.    Defendant's advertising and Products' packaging and labeling induced Plaintiff Drake and the New York Class Members to buy Defendant's Products and to pay a premium price for them.

65.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff Drake and the New York Class Members have been damaged thereby.

66.     As a result of Defendants' recurring deceptive acts and practices, Plaintiff Drake and other New York Class Members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs. This includes actual damages under GBL § 349, as well as statutory damages of $50 per unit purchased pursuant to GBL § 349.

## **THIRD CAUSE OF ACTION**
### **Violation of the New York GBL § 350**
### **(On Behalf of the New York Class)**

67.     Plaintiff Drake incorporates by reference the allegations set forth above.

68.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

69.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

70.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products are natural.

71.     Plaintiff Drake and the New York Class Members have been injured inasmuch as they viewed the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendant's representations—not natural.   Accordingly, Plaintiff Drake and the New York Class Members received less than what they bargained and/or paid for.

72.     Defendant's advertising, packaging, and products' labeling induced Plaintiff Drake and the New York Class Members to buy Defendant's Products.

73.     Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

74.     Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

75.     Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Products' packaging and labeling.

76.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

77.     As a result of Defendant's recurring acts and practices in violation of GBL § 350, Plaintiff Drake and New York Class members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs, as well as statutory damages of $500 per Product purchased.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request the Court to enter an Order:

A.   certifying the proposed Classes under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B.   declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.   declaring that Defendant has committed the violations of law alleged herein;

D.   providing for any and all injunctive relief the Court deems appropriate;

E.   awarding statutory damages in the maximum amount for which the law provides;

F.   awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.   awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

H.   awarding Plaintiffs reasonable costs and expenses of suit, including attorneys' fees;

I.   awarding pre- and post-judgment interest to the extent the law allows; and

J.   for such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all claims so triable.

Date:  January 19, 2024          Respectfully submitted,

_/s/ Charles D. Moore_
Charles D. Moore (admitted *pro hac vice*)
**REESE LLP**
121 N. Washington Ave., 4th Floor
Minneapolis, MN 55401
Telephone: 212-643-0500
Fax: 212-253-4272

SECOND AMENDED CLASS ACTION COMPLAINT

- 25 -

Email: *cmoore@reesellp.com*

**REESE LLP**
Michael R. Reese (SBN 206773)
Sue J. Nam (SBN 206729)
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email:  *mreese@reesellp.com*
          *snam@reesellp.com*

**REESE LLP**
George V. Granade (SBN 316050)
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile  (212) 253-4272
Email: *ggranade@reesellp.com*

*Counsel for Plaintiffs and the Proposed Class*