**EXHIBIT E**

**Redacted. Filed provisionally under seal.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
Case No. 3:22-cv-01085-MMA-JLB
-----------------------------------x
EDISON CORPUZ, DENIECE DRAKE,
DEBORAH BOWLING, individually
and on behalf of all other similarly situated,,
Plaintiffs,
-against-
BAYER CORPORATION,
Defendant.
-----------------------------------x
January 17, 2024
10:43 a.m.

CONFIDENTIAL

Remote Virtual Zoom Deposition of AMANDA MC CARTHY, taken by Plaintiff, pursuant to 30(b)(6) Notice, with the witness located in Short Hills, New Jersey, before William Visconti, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

REESE LLP
Attorneys for Plaintiff
100 South 5th Street, Suite 1900
Minneapolis, MN 55402
BY: CHARLES MOORE, ESQ.
cmoore@reesellp.com

LEHOTSKY KELLER COHN LLP
Attorneys for Defendant
200 Massachusetts Avenue NW
Washington, DC 20001

BY: JONATHAN COHN, ESQ.
jon@klcfirm.com
KATHERINE YAGER, ESQ.
katie@lkcfirm.com
ALEXIS SWARTZ, ESQ.
alex@lkcfirm.com

ALSO PRESENT:

SARAH HEINEMAN, Bayer
AMANDA CAMELTTO, Bayer

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

AMANDA MC CARTHY - CONFIDENTIAL

Q. To this extent, the labeling of the products is directed to the general public?

A. Yes, the labeling of the products is directed to the general consumers of the products.

Q. Is the marketing of the products directed to the general public?

A. Yes, our marketing is designed to be directed to the general consumers of the public.

Q. So the marketing is directed to the consumers?

A. Yes, it is.

Q. Are the products generally available to the general product?

A. Yes, our One-A-Day Natural Fruit Bites products at the time were generally available to the public. They are no longer available for sale.

Q. Excellent point. When did the products first become available to the general public?

A. We launched One-A-Day Natural Fruit Bites in March of 2020, that's when they

AMANDA MC CARTHY - CONFIDENTIAL
The witness may answer.
A. Again, to repeat, as far as it relates to the whole statement of natural not containing artificial ingredients that would not be expected to be in the product itself, that, generally speaking, is reasonable in my view.
Q. Stepping away from the FDA's statement. I'm asking more broadly.
Do you think it is a reasonable definition of the word natural that it does not contain artificial or synthetic ingredients?
MR. COHN: Same objection. The witness may answer.
A. Again, from my understanding there is no legal definition of natural and, you know, in my experience in the industry when consumers use the word natural they mean free of the baddies or artificial flavors, colors, sweeteners, high-fructose corn syrup. As far as it relates to bad and artificial ingredients that wouldn't normally be expected to be in the product, yes, I agree that to be reasonable.
Q. So is a synthetic ingredient one

of the baddies as you would say?

MR. COHN: Objection to the form.

A. Can you clarify your question?

Q. You said that -- in your response you said that consumers would expect that the word natural it is free of the baddies. Is a synthetic ingredient one of the baddies?

A. So when consumers use the word natural, generally speaking, in my experience in the industry they means free of artificial flavors, colors, sweeteners, high-fructose corn syrup. Generally speaking, I've never heard of consumers care about synthetic vitamins.

Q. Do you think it is reasonable if somebody would care about synthetic vitamins in a product labeled as natural?

MR. COHN: Objection, calls for a legal conclusion, form. You may answer.

A. Can you please clarify your question?

MR. MOORE: Can you read it back, please?

(Requested portion of record read.)

A. So again, based on my experience

in the industry, right, generally speaking when consumers use the word natural, they mean free of those baddies. Free of artificial flavors, colors, sweeteners, high-fructose corn syrup. I have not heard of consumers generally caring about synthetic vitamins versus vitamins from food.

It's just not something that has come up and I'm speaking with thousands of consumers, I never heard of a consumer specifically asking for a multivitamin that is completely all natural. It is not typically something that comes up.

Q. I guess my question is not whether or not -- I'm not asking you to opine on consumers. I'm asking whether or not that would be a reasonable definition.

MR. COHN: Objection, calls for a legal conclusion. Charlie, we could talk during the break. I was going advise you how you might want to ask the question in a better way, but we could talk during a break.

Anyway, as phrased, objection, legal

AMANDA MC CARTHY - CONFIDENTIAL

MR. COHN: Same objection, the witness may answer.

A. Again, you know, almost all multivitamin are made with synthetic vitamins. It is impractical to make a multivitamin without synthetic vitamins. Natural modified fruit, fruit makes up 95 percent of the product, the product is over 95 percent natural. The product doesn't have any the baddies. No artificial flavors, colors, sweeteners, high-fructose corn syrup.

Again, based on what consumers -- we understand what consumers are looking for when they say natural it is free of those baddies. They do not care about the synthetic vitamins.

Q. That was not my question. My question for you was as a representative of Bayer is it -- is it reasonable that a product labeled -- that a person would believe that a product labeled as natural does not contain synthetic vitamins. Is that reasonable?

MR. COHN: Same objection. Vague, calls for a legal conclusion. Charlie, I'm

AMANDA MC CARTHY - CONFIDENTIAL

MR. COHN: Objection, form, you can answer.

A. I would like an opportunity to review this slide in detail.

Q. Please, by all means, I apologize.

(Witness reviewing document.)

A. Okay. I'm ready. Can you repeat the question?

Q. Sure. What is the broad message conveyed by this slide?

A. This slide is -- the broad message is showing that consumers are looking for products that are free of those baddies that I mentioned before. Free of artificial flavors, colors, sweeteners, high-fructose corn syrup as an example. And this is a growing trend and interest of what consumers are looking for in products.

Q. And that is all based on the word natural; is that correct?

A. You know, again, as I mentioned before, when consumers use the word natural, they, generally speaking, they mean free of those baddies, that is why I mentioned that it

AMANDA MC CARTHY - CONFIDENTIAL

is really kind of free of artificial flavors, colors, sweeteners. So when they use that word, generally speaking, that is what they are referring to.

Q. At the top it says natural is, quote "natural is critical to category growth." Do you see that?

A. I do.

Q. What is meant by that?

A. So, again, I think more and more the trend is consumers are looking for products that are free of these baddies. And that is a growing trend, right, and where there is potential growth in the VMS category as consumers are starting to look for products that don't have these artificial flavor, colors sweeteners, etc.

Q. If you look in the left-hand column there is a paragraph that states, "Consumers are more aware than ever of potential harm of unnatural substances." Do you see that?

A. I do.

Q. What are those unnatural

AMANDA MC CARTHY - CONFIDENTIAL

this? I will give you a chance.

(Witness reviewing document.)

A. Yes.

Q. The last slide we were talking about, is it correct to say there is a -- it is detailing a consumer desire for this natural category product?

A. What I think it is fair to say, consumers have communicated to us they are looking for products that are free of these baddies, free of artificial flavors, colors, sweeteners, high-fructose corn syrup. That is what they are looking for.

Q. That concept has been encapsulated with the word natural or the natural category. Does that seen like a fair read of what that slide is telling us?

A. Yes, based on the facts that consumers when they use the word natural, they are referring to free of those baddies. That is what this is referring to here, right. Products that are free of those artificial flavors, colors, sweeteners, high-fructose corn syrup.

product. It wasn't like the candy gummy vitamins that are out there.

We know people were looking for multivitamins that had -- that were made from real fruit. This was, when you think about what we wanted to communicate to consumers, we wanted to tell them, right, this was a different type of product. This is new form. This is derived from fruit. So there is an emphasis on communicating to consumers that this product is over 95 percent fruit and that is why you see the emphasis on fruit.

Q. Why is the word natural on a different line than the word fruit?

A. Again, I can't speak to exactly the decision made there. But what I can speak to is when you look at a label like this, it looks like there is a lot more space on the side, but it is wrapped around the bottle. So you don't have as much, I call it left to right space as it looks like here for the consumers to actually read something on the front of a bottle once the label is physically wrapped around the bottle.

AMANDA MC CARTHY - CONFIDENTIAL

So that is what I believe she means here as an alternative to further qualify, the qualifier made with real fruit. It was offered as an alternative, but ultimately did not end up as the verbiage used as the qualifier under the apple.

Q. The end of this thread is Miss Gonzalez Ruiz saying, "I would keep the test. Consumers love those words." Do I have her statement correct?

A. That's what it says and it is my understanding love the words "made with real fruit" which is ultimately what ended up on the label as the qualifier. If you look down below she talks about to please use the language that is used in the concept made with real farm grown fruit, so made with real fruit keeping that. That's what she likely means when she talks about keeping the words that consumers liked when we tested the overall concept of product. Which is what you see in that page, I think it is the second page.

So again I think it was just reinforcing the desire to keep made with real

AMANDA MC CARTHY - CONFIDENTIAL

fruit which was tested within concept which was well-received by consumers and that's what ultimately stayed on the label.

Q. Shifting gears a little bit. How much does the product cost?

[redacted]

Q. Is there a manufacturer suggested retail price?

[redacted]

Q. What is that?

[redacted]

Q. How did you come to that price?

[redacted]

AMANDA MC CARTHY - CONFIDENTIAL

[redacted]

Q. Is there any consideration of other product prices in that category?

A. Can you clarify what you mean?

Q. Yes. When you guys are looking at your pricing model and how much you're going to set a price at, do you take into consideration other competing products in that category?

[redacted]

Q. Do you consider at all what other natural multivitamins were out there that

AMANDA MC CARTHY - CONFIDENTIAL
A. Yes, the product also has natural ingredients, flavors, colors, sweeteners.
Q. Why do you mention those things specifically?
A. Because that is what consumers care about. The products that they have are free of those baddies, free of those artificial flavors, colors, sweeteners, high-fructose corn syrups. That's what we hear from consumers what they care about.
Q. To what extent, if any, do consumers care about synthetic vitamins?
A. Not at all, as far as I can tell.
Q. How do you know?
A. So first of all, again, it just not something that we generally hear. Before this lawsuit was filed we had not heard of consumers generally carrying about synthetic vitamins within multivitamins. It is just not something they have asked for in an all natural multivitamin.
I actually spoke with my colleagues related to this, including my predecessor in the role and they also confirmed

that they have not heard of consumers caring about synthetic vitamins versus vitamins from food within their multivitamins. And after this lawsuit was filed I did take a look at consumer comments and the issue almost never comes up.

There is maybe a small handful of consumers who asked about it, but again, it almost never comes up. It is not something generally that consumers care about or ask about.

Q. So to what extent, if any, is Bayer concerned that consumers of Natural Fruit Bites think the vitamins themselves are natural?

A. We are not.

Q. Why not?

A. Again, it is just not something that consumers care about. It is not something we hear they generally care about synthetic vitamins within a multivitamin. They haven't expressed or asked for all natural multivitamins.

And again, I think consumers know that multivitamins are a manufactured

consumers, they continue to reinforce what they care about is their products are free from the baddies. Free from those artificial flavors, colors, sweeteners, high-fructose corn syrup. That is what they care about and what matters to them, not that the product is all natural.

Q. Do you see the phrase that begins, "There is more skepticism"?

A. Yes, I do.

Q. Can you read the rest of that sentence?

A. "There is more skepticism around the term all natural because it can mean a lot of things and there is a sense that this label can get slapped on to things that aren't healthy."

Q. Do you agree with that statement?

A. I do.

Q. Why?

A. Based on my experience consumers can be suspicious of all natural claims.

Q. To what extent, if any, do you understand how consumers use the term all natural?

AMANDA MC CARTHY - CONFIDENTIAL

ingredients?

A. Within the supplement facts on the back label we list all of the vitamins by their chemical names. And those are the synthetic vitamins that are clearly disclosed.

Q. What extent, if any, have consumers told you they don't understand those items as being synthetic?

A. Not at all.

Q. Is it possible to make a multivitamin that is 100 percent natural?

A. It is very impractical to make a multivitamin that is 100 percent natural. There would be stability and consistency issues. There would be product quality issues. The serving size would have to be enormous. It would be very expensive. And all of that would have no proven benefit. In fact the FDA prohibits companies from saying natural vitamins from food are superior to synthetic vitamin.

Q. Earlier today you mentioned something call the LMR process. What is that?

A. The LMR process is a legal,

AMANDA MC CARTHY - CONFIDENTIAL

Q. Does the document indicate any rationale for why the team was aligned?

A. Yes, it does.

Q. What is the rationale?

[redacted]

A. Yes, I do.

Q. Is that what you referred to when you mentioned proxies?

[redacted]

AMANDA MC CARTHY - CONFIDENTIAL

[redacted]

Q. To what extent, if any, did the word natural affect the price?

A. Not at all. [redacted]

MR. COHN: That is all I have, Charlie, you can have the witness back.

MR. MOORE: Thank you.

EXAMINATION BY MR. MOORE:

Q. Let's return to Defendant's Exhibit 1. And we are going back to Bates number 116568. Page 45.

A. Okay, I'm there.

Q. Who is Kantar?

A. Kantar is a third-party agency that we use that helps us assess the landscape, competitive landscape. How products are being perceived, etc.

Q. Did Bayer conduct a survey on

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, WILLIAM VISCONTI, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 26th day of January, 2024.



WILLIAM VISCONTI

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.