## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DONIECE DRAKE and DEBORAH BOWLING, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BAYER HEALTHCARE LLC,<br><br>Defendant. | Case No. 3:22-cv-01085-MMA-JLB<br><br>**REPLY DECLARATION OF DR. ANDREA LYNN MATTHEWS** |

Pursuant to 28 U.S.C.§ 1746, I declare:

I have been retained by counsel for the Plaintiffs in this matter. If called upon to testify, I would and could testify competently to all such subject matter in this expert report.

1.       I previously wrote a declaration and export report dated February 19, 2024 (the "February 19 Report"), which documented and reported on the results of a consumer survey that I created and analyzed with William Ingersoll, Ph.D., of Phillips, Fractor, & Company, LLC ("Phillips Fractor"). *See* ECF No. 90-23. I provided my qualifications, as well as the list of other cases in which I testified as an expert at trial or by deposition during the previous 4 years in the February 19 Report. I provided my updated list of cases in Exhibit A.

2.       In the February 19 Report, we concluded that a majority of consumers surveyed believed Defendant's One a Day Natural Fruit Bites Multivitamins (the "Product") contained only natural ingredients and that the Product's "natural" label claim was material to the purchase decision of the consumers surveyed.

3.       I understand that Defendant submitted the Expert Report of Dr. Ran Kivetz (the "Kivetz Report"). Plaintiffs' counsel asked me to review and address that portion of the Kivetz Report that relates to the February 19 Report regarding consumer perceptions and materiality.

4.       The Kivetz Report disputes the February 19 Report (1) by claiming that we provide no support for Plaintiffs' position that the word "natural" on the Product label impacts consumers' perceptions of the ingredients contained in the Product and (2) by lodging multiple criticisms regarding the methodologies used in our consumer surveys. The Kivetz Report also discusses the surveys that Dr. Kivetz himself conducted and his conclusions based on those surveys, which supposedly contradict our findings that the challenged "natural" claim is a common, material factor in consumers' purchase decisions.

5.      In this Reply Report, based on the results of a follow-up study, we conclude that the word "natural" in the context of a label of a multivitamin bottle conveys to a majority of consumers that the multivitamin product contains only natural ingredients. These results strengthen and support the February 19 Report's finding of deception, *i.e.*, that consumers believe the Product only contains natural ingredients, as well as materiality, *i.e.*, that consumers would prefer to purchase multivitamins, including the Products, labeled as "natural" compared with multivitamins not labeled as natural, and would prefer to purchase multivitamins made with only natural ingredients compared to multivitamins made with both natural and synthetic ingredients.

# I.      EXECUTIVE SUMMARY

## A.  ADDITIONAL EVIDENCE OF THE COMMON CONSUMER PERCEPTION THAT A "NATURAL" MULTIVITAMIN ONLY CONTAINS NATURAL INGREDIENTS

6.      Dr. Kivetz opines that we failed to properly isolate the "natural" claim among other non-challenged claims such as the One a Day brand or the Product's "free from" claims. See Kivetz Report at p. 10. The following is an example of the label that we showed one randomly assigned group of consumers.



7.      We conducted a follow-up experimental study that isolated the "natural"

representation for a multivitamin product, independent from the other verbal and pictorial elements on the Product's label. As before, this process was scientifically rigorous and used appropriate methodology and best practices.

8.    A total of 392 individuals completed the survey experiment. Of these, 198 individuals were randomly assigned to view a generic multivitamin label that included the word "natural," as shown below.



9.    In total, 58.6%, (116/198 individuals) believed that this generic multivitamin product contained only natural ingredients.

10.    In comparison, we assessed the same multivitamin label that removed the word "natural," as shown below.

3



11.     A different set of 194 individuals were randomly assigned to view this condition for the label without the word "natural."

12.     Overall, only 15.5% of the 194 consumers in the condition for the label that did not include the word "natural" (95% CI: 10.3%, 20.6%) believed that the product contained only natural ingredients. Thus, for the general target market of individuals, removing the word "natural" from the product label was associated with a decrease of 43.1 (=58.6-15.5) percentage points, or a decrease of 73.5% (=43.1/58.6) in consumer belief that the product contained only natural ingredients.

13.     We believe that the new survey provides further evidence that the majority of consumers believe the "natural" representation means the Product contains only natural ingredients. We present the methods and results of this study in detail in Exhibit B of this Reply Report.

## B. THE FLAWS IN DR. KIVETZ'S SURVEY METHODOLOGY AND HIS CONCLUSIONS

14.     Dr. Kivetz purported to isolate the claim at issue by designing surveys that retained "the myriad [of] other elements both on and outside the label," Kivetz Report at p. 12, but removed

only the word "natural." *Id.* at pp. 31-34.

15.     The fundamental flaw of this methodology is that by failing to isolate the challenged claims from the non-challenged claims and then asking consumers their *absolute* likelihood of purchase rather than asking consumers to *choose between* two products, Dr. Kivetz's consumer surveys  likely underestimated the extent to which the challenged "natural" claim is important to consumers. Dr. Kivetz's materiality studies, unlike our follow up survey, do not allow consumers to choose between a product that contains only the claim in question ("natural") versus one that does not.

16.     If the "natural" attribute were not the most important factor to consumers, the design of Dr. Kivetz's surveys would  not be sufficiently precise to account for consumers' desires for the other claims on the label.  In other words, Dr. Kivetz's surveys do not demonstrate that the challenged "natural" claim is **immaterial** to consumers. They show merely that the "natural" claim may not be **the most important claim** on the Product's label. We present our criticisms of Dr. Kivetz' surveys in Sections III and IV of this Reply Report.

## C. THE FLAWS IN DR. KIVETZ'S CRITICISMS OF OUR SURVEY METHODOLOGY

17.     The following are some of the more glaring flaws in Dr. Kivetz's criticisms of our survey methodology, used for the prior and follow-up surveys. We discuss these and other flaws more in-depth throughout this Reply Report.

18.     First, Dr. Kivetz makes the often-repeated but easily rejected criticism that close-ended questions are inherently unreliable and biased. *See* Kitvetz Report at p. 11. ("The Matthews 'Perception' Survey relied on a single closed-ended question that was extremely leading, vague, and biased in favor of the Plaintiffs."). While Dr. Kivetz may believe that closed-ended questions are inferior to open-ended questions, the field of survey methodology disagrees with him. As

explained in detail in Section VII, we used best practices to design surveys to obtain correct, accurate, and precise estimates of consumer perceptions. We repeatedly found that a majority of consumers believe, based on the Product label including its "natural" representation, that the Product only contained natural ingredients. We also repeatedly found that the "natural" claim had a material positive effect on consumers' likelihood of purchasing the Product and multivitamins in general. Finally, we found consumers overwhelmingly prefer to purchase a product that contains only natural ingredients versus a product that contains natural and synthetic ingredients.

19.    Second, Dr. Kivetz takes issue with our use of a so-called "fake" brand as part of our study *See* Kivetz Report at p. 11. By using the loaded word, "fake," this argument ignores the importance and essential nature of using a control condition in gold-standard experimental best practices. It is appropriate and scientifically correct procedure to include control conditions that are identical to the experimental conditions "but for" the single attribute that is being tested. *See* Section VI below.

20.    Finally, Dr. Kivetz makes certain categorically false statements such as claiming that we "did not report the full distribution of responses to the key closed-ended questions," Kivetz Report at ¶ 124. We correct this and other misstatements by Dr. Kivetz in paragraphs 138 and 159.

## II.    EVIDENCE THAT THE WORD "NATURAL" IMPACTS CONSUMER PERCEPTIONS.

21.    Our previous survey results referenced in the February 18 Report showed that a majority of consumers believed that the Product contains only natural ingredients, as opposed to both natural and synthetic ingredients or only synthetic ingredients. We specifically tested the two versions of the Product label that were found in the marketplace, Label A—the earlier version found in the marketplace—had the phrase "Fruit is the First Ingredient" while Label B—the later version found in the marketplace—did not. In both instances, we compared consumer perceptions

regarding the label to consumer perceptions regarding the  control label that mirrored the test, except for the removal of the word "natural."

22.     We found that 55.6% of consumers who viewed the test version (i.e., with the word "natural") of Label A and 58.9% of consumers that viewed the control (i.e., without the word "natural") believed the Product only contained natural ingredients. We obtained similar results for Label B where 60.4% of consumers who viewed the test version and 56.3% of consumers that viewed the control version believed that the Product contained only natural ingredients. Notably, for both the test and control, a majority of consumers believed the Products only contained "natural" ingredients.

23.     Based on the lack of statistical significance between the test and control conditions in this experiment, namely retaining or removing the word, "natural" from the Product's labels, Dr. Kivetz concludes that our "own survey results provide further evidence that that there is no likelihood of deception in this matter." *See* Kivetz Report at p. 12. This conclusion is overstated. As just discussed, across the board, a majority of consumers surveyed believed the Products contain only natural ingredients.

24.     Complicating the experimental testing, there were many statements on the label which may have impacted consumer perceptions. As Dr. Kivetz acknowledged:

> [T]the disputed Bayer products' labels reveal many (non-challenged) textual and visual representations, claims, and attributes, which could inform not only consumers' perceptions but also influence their purchase decisions. Such packaging elements include, but are not limited to: the Bayer and One A Day brand names and logos; the product name, including whether it is tailored for men or women, as well as a particular age range ("50+"); visual aspects of the package and product; prominent imagery of apples; multiple fruit-related statements ("Made with real fruit"; "Fruit is the first ingredient"); multiple "free from" claims (e.g., "No High Fructose Corn Syrup," "No Artificial Sweeteners or Flavors"); the Supplement Facts panel (including the identity, amount per serving, and %DV of each vitamin and mineral); and other ingredients listed on the back panel (e.g., "Apple Puree Concentrate").

Kivetz Report at ¶ 94. Dr. Kivetz nonetheless did not isolate the "natural" representation from these other label statements in his own surveys and conclusions. *See* Kivetz Report at pp. 31-34.

25.     In our new study, we isolated the challenged "natural" representation from the non-challenged textual and visual representations on the Products' label in order to better understand the impact of this term, apart from the other potentially reinforcing messages on the label such as "No High Fructose Corn Syrup" and "No Artificial Sweeteners or Flavors."

26.     This follow-up study confirmed the statistically positive impact of the "natural" claim on consumer perception and preference of multivitamin products. However, I was specifically instructed at my deposition by defense counsel to not discuss this study or its conclusions.

### A. CONSUMERS' COMMON UNDERSTANDING ABOUT THE "NATURAL" CLAIM ON MULTIVITAMINS

27.     We followed a similar methodology to that described in the February 19 Report to test consumer perceptions in the follow-up study. A total of 392 individuals completed the survey experiment. As before, we used a process for the study that was scientifically rigorous, and we used appropriate methodology and best practices. Attached as Exhibit B is a detailed explanation of the methodology, survey questions, and the results.

28.     Of the total 392 individuals who completed the survey experiment, 198 individuals were randomly assigned to view the Product's label with all text and images other than the words "Natural" and "Multivitamin" removed. The word "Multivitamin" was used to identify the type of product at issue.

29.     58.6% (116/198 individuals) believed that this product contained only natural ingredients. Using bootstrapping methodology (Lohr 2021) and 25000 iterations, we calculated a 95% confidence interval around the 58.6% estimate for this label of between 51.5% and 65.2% for

the population as a whole.

30.     Next, we focused on those individuals who viewed the "Natural" Label who had previously purchased Bayer One a Day products. In total, 21 of the 198 individuals who viewed the "Natural" Product Label (10.61% = 21/198) had purchased at least one Bayer One a Day product in the last 12 months.

31.     Of these, 52.4% (11 of 21 individuals) who viewed the "Natural" Product Label believed that the generic Multivitamin product contained only natural ingredients.

32.     In comparison, a different set of 194 individuals were randomly assigned to view the above label that removed the word "natural." In other words, the only text on this label was "Multivitamin."

33.     Of these, 23 individuals (11.86% = 23/194) had previously purchased Bayer products in the past 12 months.

34.     Overall, 15.5% of the 194 consumers in the condition for the label that did not include the word "natural" (95% CI: 10.3%, 20.6%) believed that the product contained only natural ingredients. For past purchasers of any Bayer vitamin dietary supplements, 21.7% (6/23) believed that the Product contained only natural ingredients.

35.     Thus, for the general target market of individuals who had purchased vitamin dietary supplements at all in the past 12 months, removing the word "natural" from the product label was associated with a decrease of 43.1 (=58.6-15.5) percentage points, or a decrease of 73.5% (=43.1/58.6), in consumer belief that the product contained only natural ingredients. For past purchasers of Bayer products, removing the word "natural" from the label was associated with a 30.7 (=52.4-21.7) percentage point decrease.

36.     For each of these labels, we also confirmed that these results were similar across

various demographic groups, such as gender, race, ethnicity, education level, income level, region, and industry.

## III. BY FAILING TO PROPERLY ISOLATE THE "NATURAL" CLAIM, DR. KIVETZ'S SURVEY DESIGN IS IMPRECISE AND LIKELY UNDERPOWERED

37.     It is my understanding that Plaintiffs allege that the "natural" claim on the Product labels are material to consumers' purchase of the Product. Thus, the "natural" claim does not need to be *the most important* factor driving consumers' purchase decisions, or even one of the top three most important, but simply an attribute that separately and independently affects consumers' purchasing decisions. Dr. Kivetz's between-groups design, where consumers only see one version of a product, is not the best approach for assessing the independent effect of a claim that is one of many drivers of consumer behavior.

38.     Dr. Kivetz's studies first asked consumers about their "most important considerations when deciding which adult multivitamins to buy" in an open-ended fashion, then randomly assigned consumers to either view a test condition ("natural" label present) or control condition ("natural" label removed). Kivetz Report at ¶¶ 33-39. He then asked consumers 1) how likely they would be to purchase the product shown, 2) the reasons they would or would not purchase (open-ended), and 3) the highest price they would pay for the product. *Id.* at ¶¶ 40-42. Dr. Kivetz then statistically compared consumers' reported likelihood of purchase and willingness to pay and found no statistical differences between groups. *Id.* at ¶¶ 50-64.

39.     It is important to understand that, because Dr. Kivetz's study design failed to isolate the challenged "natural" claim from other non-challenged claims, it leads to likely underestimates of the proportion of consumers who find the "natural" claim to be important and is imprecise in its ability to identify whether or not the term "natural" is important to consumers.

40.     Consumers in his study were only shown one potential product and asked how

likely they would be to purchase that product and how much they would likely pay for it. In each condition, there were many claims made on the product label, including the brand, the word "fruit bites," the number of vitamins included, a picture of an apple, and so forth, in addition to the presence or absence of the word "natural." Many of these claims were likely important to consumers and would likely impact their willingness to purchase and willingness to pay for the product. It appears from Dr. Kivetz's studies that the vitamins were indeed desirable to a large number of consumers: over 70% of New York consumers indicated that they would "definitely" or "probably" purchase the men's and women's vitamin product, and over 40% of California consumers indicated they would "definitely" or "probably" purchase the men's and women's 50+ vitamin product.

41.     If one or multiple of the other claims on the product tended to increase consumers' purchase intentions and willingness to pay by a *relatively large* amount compared to the impact of the term "natural," then we would expect statistically to see a *relatively large* amount of noise in the survey answers. While we would still theoretically expect to see an impact of the challenged claim on overall purchase intent and willingness to pay *with a large enough sample*, this impact might be extremely small and statistically nonsignificant depending on the desirability of the *other factors* that are present in the product.

42.     For instance, one could hypothetically imagine the invention of a product that permanently cures cancer. This product might *also* feature another aspect that is important to consumers, such as having a pleasant taste. If consumers were shown *either* a version of the product which "only" cured cancer, *or* a version that both cured cancer and had a pleasant taste, then asked how likely they would be to purchase it, one would expect to see *extremely high* rates of intentions to purchase across both conditions. In a test such as this that only assesses the claim

of taste in *relative importance* to other factors, the impact of the additional attribute of pleasant taste on willingness to purchase or highest amount willing to be paid would likely be so small that it would not be statistically detectable. From this test, one might incorrectly conclude that taste is unimportant to consumers. However, if consumers were given a choice between both products that cured cancer, where one had a pleasant taste and one made no mention of taste, it is a reasonable hypothesis that a strong majority of consumers would choose the product that *also* had a pleasant taste. Thus, the importance of taste would be detectable in a choice task where all other important attributes are held constant, but not as detectable in a between-groups design where other important attributes may mask the importance of the attribute in question. In other words, a between-groups study of this sort may be underpowered.

43.    Dr. Kivetz's own results show that in every demographic group, the percentage of individuals who say that they would "definitely purchase" the product is numerically higher when the natural claim is present (test condition) compared to when it is absent. *See* Kivetz Report at pp. 37-38. The fact that this difference is small and nonsignificant in his samples may reflect a lack of power in his study (approximately 420 individuals in each of his four subgroups, *e.g.*, Men NY; Female CA) due to the number of other factors that may be driving purchase intentions.

44.    Dr. Kivetz, in his deposition testimony, stated that he believed that a sample size of 200 individuals per condition was "more than sufficient," and was a "very large sample that would detect significant differences." Kivetz Dep. 179:11-180:13. While this would likely be true if Dr. Kivetz's design were only testing the importance of the word "natural" in isolation, by allowing respondents to choose between two designs (as our study did – and found statistically significant results), Dr. Kivetz's study did not test the importance of the word "natural" in isolation, as explained above. Therefore, it is necessary to run a power analysis to determine whether Dr.

Kivetz's "noisy" study actually would have the ability to identify statistical differences if they exist in the population.

45.     As a quick, back-of-the-envelope calculation, I ran a post-hoc power analysis at the website https://clincalc.com/stats/Power.aspx to calculate the power from Dr. Kivetz's study. First, I ran this analysis using the study incidence of 15% for Group 1 (n=200) and 11.5% for Group 2 (n=208), to reflect the percent of Men 50+ in California who indicated in Dr. Kivetz's study that they would "definitely" purchase the product. Using Dr. Kivetz's design of two independent groups and a dichotomous dependent variable, as well as an alpha of .05, the calculated power was 0.18. In comparison, a power of 0.8 is a commonly recommended power for a study. In other words, based on Dr. Kivetz's sample size, it is far more likely than not to fail to find a statistical relationship, even when one exists.

46.     Second, I next ran this post-hoc power analysis using the same calculator on https://clincalc.com/stats/Power.aspx on Dr. Kivetz's Men's (New York Survey) study. To conduct the post-hoc power calculation, I used the study incidence of 50.2% and 203 subjects for Group 1 and the study incidence of 48.3% and sample size of 205 for Group 2, to reflect the percent of Men in New York who indicated in Dr. Kivetz's study that they would "definitely" purchase the product. Using Dr. Kivetz's design of two independent groups and a dichotomous dependent variable, as well as an alpha of .05, the calculated power was 0.057. Again, a power of 0.8 is a commonly recommended power for a study. In other words, based on Dr. Kivetz's sample size, it is far more likely than not to fail to find a statistical relationship, even when one exists.

47.     Third, I next ran this post-hoc power analysis at the same website on Dr. Kivetz's Women's (NY) Survey. For this power calculation, again performed using the calculator on https://clincalc.com/stats/Power.aspx, I used the incidence rate of 38.9% and sample size of 211

subjects for Group 1 and the study incidence rate of 38.6% and sample size of 202 individuals for Group 2, to reflect the percent of Women in New York who indicated in Dr. Kivetz's study that they would "Definitely" purchase the product. Using Dr. Kivetz's design of two independent groups and a dichotomous dependent variable, as well as an alpha of .05, the calculated power was 0.029. Again, a power of 0.8 is a commonly recommended power for a study. In other words, based on Dr. Kivetz's sample size, it is far more likely than not to fail to find a statistical relationship, even when one exists.

48.    Fourth, I next ran this post-hoc power analysis using the same calculator on https://clincalc.com/stats/Power.aspx to calculate the statistical power for Dr. Kivetz's Women (50+, California) Survey study. I used the study incidence rate of 16.7% and 210 subjects for Group 1, and the study incidence rate of 15.9% and 207 subjects for Group 2 to reflect the percent of Women aged 50+ in California who indicated in Dr. Kivetz's study that they would "Definitely" purchase the product. Using Dr. Kivetz's design of two independent groups and a dichotomous dependent variable, as well as an alpha of .05, the calculated power was 0.041. In comparison, a power of 0.8 is a commonly recommended power for a study. In other words, based on Dr. Kivetz's sample size, it is far more likely than not to fail to find a statistical relationship, even when one exists. Thus, it is well beyond the power of the study to claim that the word "natural" is unimportant to consumers; the sample size that Dr. Kivetz used makes such a claim beyond the reasonable scope of his between-group study.

49.    Thus, rather than the between-groups design used by Dr. Kivetz, where consumers only see one version of a product, we believe our within-subjects design to test materiality, whereby we explicitly ask consumers to choose between two versions of a product, is more efficient and effective.

## IV.    DR. KIVETZ'S OPEN-ENDED QUESTIONS LIKELY UNDERESTIMATE THE IMPORTANCE OF THE WORD NATURAL

50.    Dr. Kivetz uses open-ended questions to incorrectly conclude that the phrase "natural" is not important to consumers.  One problem with his use of open-ended questions is that he used a "memory test" format, which is likely to underestimate the number of people who believe that the word "natural" is at all important to their purchase decisions. Each participant was first asked the closed-ended question whether they would purchase the product (Q.30) and were given six possible answers (i.e., "definitely would buy this product"; "probably would buy this product"; "may or may not buy this product"; "probably would not buy this product"; "definitely would not buy this product"; or "don't know"). Kivetz Report at ¶¶ 54-55. Depending on how the participant answered, they were then asked 1 of 5 possible open-ended questions with their response from Q.30 plugged into the end. *Id.* ¶¶ 57. So, depending how they answered, participants could be asked "What makes you say that you *definitely would buy this product*?" or "What makes you say that you *definitely would not buy this product*?" among other options. However, respondents were not permitted to look at the product label while answering this open-ended question. Kivetz Dep. page 138:6-18. Dr. Kivetz admitted that, using this form of question design, consumers might not give all the reasons that they would purchase a product ("if you are suggesting that not necessarily all the reasons would come out, that could happen"). Deposition Testimony page 140:9-141:6. Instead, when a stimulus is removed from respondents' view, they are likely to give the answers that are top-of-mind and that remain in their short-term memory. Cognitive psychology research has identified that, on average, people can hold roughly four or five separate pieces of information in their minds at one time (e.g. Cowan 2001). If consumers value the word "natural" but value other factors on the label more, the word "natural" may not be retained in short-term memory and therefore may not be reported in the open-ended questions.

51.     Another problem with his use of open-ended questions is the way his question regarding people's explanation for their purchase intent was phrased. As previously discussed, participants' answers to the purchase intent question drove the question wording for the open-ended question.  For instance, some participants were asked, "What makes you say that you **_definitely would buy this product_**?" while others were asked "What makes you say that you **_definitely would <u>not</u> buy this product_**?" *Id.* These very different questions elicited very different answers.

52.     While the "definitely would buy" and "probably would buy" questions elicited a majority of positive statements about the Products (*e.g.*, 183 positive responses, 17 negative responses, and 31 neutral responses)[1], the "may or may not buy", "probably would not buy", and "definitely would not buy" questions elicited a majority of negative responses about the Products (*e.g.*, 32 positive responses, 131 negative responses, and 96 neutral responses). These results are to be expected, as the question "What makes you say that you **_definitely would buy this product_**?" is likely to elicit a response about what the person likes about the Product, while the question "What makes you say that you **_definitely would <u>not</u> buy this product_**?" is likely to elicit a response about what the person dislikes about the Products.

53.     According to Gricean conversational norms of quantity and relevance (Grice 1975), consumers are likely to focus their answers to ensure that they are not giving more information than requested and to ensure that all the information they give is relevant to the question that is asked. As such, if asked a question eliciting positive information (what makes you say that you *definitely would buy*, or *probably would buy* this product), consumers may focus their answers to give only or mostly positive information. If asked a question eliciting negative information (what

---

[1] Kivetz Report, Ex. F.6, Table 2.

makes you say that you *definitely would not buy*, or *probably would not buy* this product), consumers may similarly interpret the question as asking for them to explain the negative components of the product that would lead them to not purchase it. Positive aspects of the product may, according to Gricean norms, be seen as information that is not being requested, and therefore not be provided by consumers. In other words, consumers might value the fact that a vitamin is "natural," but it would be reasonable for them to follow conversational norms and mention this fact if they are asked "what makes you say that you definitely would not buy this product?"

54.    Dr. Kivetz fails to explain how asking someone why they "would <u>not</u> buy the product" is likely to elicit a response that includes their positive feelings about the word "natural" and/or the Products' natural qualities. Yet more than half of the California participants were asked the "bottom 3" negative questions. *See* Kivetz Report ¶ 54, Tables A.2.c-d. This leaves less than 100 people in each California survey being asked questions with the potential to elicit answers about the "natural" quality of the Products.

55.    Despite this, Dr. Kivetz reaches his conclusion based on the lack of participants mentioning "natural." *Id.* ¶ 59.

56.    A related problem afflicts Dr. Kivetz's control analysis. In the control, participants were shown a version of the label that did <u>not</u> have the word "natural." *Id.* ¶ 48. To assess the importance of the word "natural" to consumers, therefore, consumers in these conditions would have to 1) identify the *absence* of a claim (e.g. "it didn't say it was natural") and 2) include it as a reason that they either would or would not buy a product. This is scientifically problematic, as open-ended questions are good at capturing individuals' top-of-mind thoughts, but are very bad at identifying everything that is important to consumers that may not be top-of-mind (*e.g.*, Schuman and Presser 1979; Reja et al. 2003; Diamond 2011; Diamond and Swann 2012).

57.     The above becomes even more problematic given that Dr. Kivetz's conclusions would be based on assuming that respondents are breaking Gricean conversational norms. In this survey, 85.9% of New York men and 75.7% of New York women indicated that they probably or definitely would purchase the product. *Id.* ¶ 54, Tables A.2.a-b.  As such, these respondents would have been asked as a follow-up, what makes you say that you *definitely would buy*, or *probably would buy* this product. Any respondents who did value the word "natural" would have needed to include in their answers a negative statement about a lack of the word "natural" in a question asking about their reasons for a positive behavioral intention. It is therefore unlikely that respondents in these categories would have mentioned the word "natural" even if it were important to them.

58.     In contrast, there were only 29 New York men and 48 New York women who were asked what made them said they would be *unlikely* to purchase the product (*Id.* ¶ 54, Tables A.2.a-b.), and thus would not be breaking Gricean conversational norms if they answered that the product did not say that it was natural. Given that open-ended questions are notoriously poor at eliciting responses on topics that are not top-of-mind for respondents, Dr. Kivetz's conclusions that the lack of "natural" responses in the control is evidence that the "natural" statement is not material (*Id.* ¶ 60.) are extremely weak and go beyond his data.

## V.     OUR SURVEYS COMPLY WITH WELL-ESTABLISHED SURVEY STANDARDS

59.     We agree with Dr. Kivetz that, "to reach valid and reliable opinions about consumers' perceptions, preferences, and likelihood of deception," we should have "designed and conducted our surveys based on scientific methodologies that are relied upon in the relevant field of expertise and according to well-established survey standards, including, but not limited to, the following seven factors listed in the *Manual for Complex Litigation*." Kivetz Report at ¶ 126. That

is why we followed not only each and every one of those seven factors but also additional best practices as laid out in the survey methodology literature (*e.g.*, Bradburn et al. 2004, Diamond and Swann 2012, Dillman et al. 2014, Schuman and Presser 1996, Tourangeau et al. 2000).

60.    Dr. Kivetz is wholly mistaken in suggesting otherwise. *See* Kivetz Report at ¶ 128.

61.    Our methodology complied with each of the seven factors listed in the *Manual for Complex Litigation*, as explained briefly below, and we address Dr. Kivetz's specific critiques in more detail throughout this Reply Report.

(i)    Our population was properly chosen and defined. We defined our population as adult US individuals 1) who were at least 18 years of age, 2) who were residing in the United States, and 3) who had purchased vitamin dietary supplements at least once in the past 12 months for their personal use. Our goal was to assess what "reasonable consumers" perceived about the product, and their preferences for products with different labels or ingredients, which indicates whether the word "natural" is important to consumers, holding all other factors constant, and whether it is important to consumers, holding all other factors constant, that products that contain "only natural ingredients." We controlled for region of the country and found no significant differences in either consumers' perceptions of or preferences for vitamin products based on region.[2]

(ii)    The sample chosen was representative of our population. Dr. Kivetz does not identify any problems with our sample selection procedure, and uses a nearly identical procedure in his materiality studies.

(iii)    The data gathered were accurately reported. Dr. Kivetz's statement that we did not report the full distribution of responses to our key closed-ended questions is simply inaccurate; they were included as an Appendix beginning on page 116 of the report.

---

[2] If we were to apply this same critique to Dr. Kivetz, he failed to test any New York participants over the age of 50, or any California participants under the age of 50. Thus, under his own critique, his survey results could not be applied to these populations, yet he showed no qualms about doing so.

Additionally, as discussed later in this Reply Report, Dr. Kivetz's claim that our methods of reporting percentages of individuals who preferred "only natural ingredients" is "nonstandard, unscientific, and biased" is incorrect. Our decisions are justified, logical, reasonable, and based on the scientific literature (e.g. Young 2012, dissertation; Krosnick et al. 2002; Groves et al. 2004; Converse 1976). In addition, we do list the entire breakdown of responses to these variables on pages 139-143 of our report, thus providing a comprehensive and accurate report of all of the underlying raw data even if one chooses to compute variables in a different manner.

(iv)    The data were analyzed in accordance with accepted statistical principles. We used, for instance, bootstrapping analysis to calculate confidence intervals around a point, ordinal logistic regression, and similar statistical tests. Dr. Kivetz does not argue with our choice of statistical testing, and it is more thorough than his own statistical analysis.

(v)    The questions asked were clear and non-leading. Dr. Kivetz's assertions to the contrary on this point reflect his lack of understanding of best practices regarding the writing of valid closed-ended survey research questions, which have been accepted by the field of survey methodology for decades. We followed standard methodological practice in the field of survey methodology (Bradburn et al. 2004, Diamond and Swann 2012, Dillman et al. 2014, Schuman and Presser 1996, Tourangeau et al. 2000) to design the order, wording, and response options for our survey questions. We carefully considered question and response wording and formatting to ensure objectivity and avoid bias. Representative respondent comments indicated that the survey was "easy," and that they "loved it and enjoyed it," which indicates that the questions were not difficult to understand or answer. We discuss point-by-point why our questions were clear and non-leading throughout this Reply Report.

(vi)    The survey was conducted by qualified persons following proper interview procedures. Dr. Kivetz does not dispute this fact, as our methodology is

20

substantially similar to the one that he employs.

(vii)   The process was conducted so as to ensure objectivity. Dr. Kivetz does not argue with our choice of a self-administered mode of survey process, or our general questionnaire design that flowed from screening questions to distractor questions (which were included as part of the process to ensure objectivity) to main questions of interest to demographic questions. The only issue of process that Dr. Kivetz raises is our choice of a quasi-filter question in the perception survey. However, the very reference that he cites to support his critique is the one that concludes that quasi-filter questions such as we chose to use are actually the best form of filter questions to use (Diamond 2011 pp. 250-251); this methodology minimizes both under-reporting and over-reporting of substantive answers.

62.    In sum, we followed best practices, and our results and conclusions are sound.

## VI.  OUR SURVEYS' ISOLATION OF CONDITIONS IS APPROPRIATE AND SCIENTIFIC

63.    Dr. Kivetz asserts that our conditions tested a "fake brand," which violate marketplace conditions and are irrelevant to the litigation. Kivetz Report at p. 11. These concerns are extremely flawed, and the use of the term "fake" in this context is disingenuous and misleading.

64.    While it is important for methodology to mirror marketplace conditions as closely as possible, it is also important to isolate the impact of the relevant claim apart from any possible effects of the brand name on consumers' perceptions. It is very likely that consumers' perceptions of a given brand will impact their perceptions of the ingredients in a product put out by that brand. As such, in order to isolate the effect of the word "natural," one has two options: 1) either one can show the product without any brand name present, which would in fact violate marketplace conditions and does not assess whether the brand name has any effect, or 2) one can show both the brand name in one set of conditions and a fictional brand name in a different set of conditions through a factorial experimental design, thereby testing whether the brand name has an interaction

effect with the attribute at hand. We choose to follow the second option, which replicates the marketplace better than does the first option.

65.    We did not distort marketplace conditions, and we did not fail to test the Plaintiffs' theory of deception in this litigation. The so-called "fake brand" conditions rely on stimuli that are identical in every way to the Product label except for their replacing of the well-known brand information ("One a Day") with that of an unknown, fictitious brand. We use these conditions as a set of control conditions so that we can compare the results from the brand conditions to a set of conditions that are identical but for the "One a Day" brand name. Thus, this experiment allows us to test whether the word "natural," in the context of all of the components of the Product label except for the brand name, impacts consumer perceptions regarding what ingredients are present in the product. This experiment also allows us to specifically assess whether there is an interaction between the brand name and the word "natural" for this product, which is very relevant for this litigation.

66.    Dr. Kivetz further argues that, "to the extent that Dr. Matthews's used a 'fake brand' in order to account for participants' preexisting beliefs (*e.g.*, knowledge about the Bayer brand), such an approach would be diametrically opposed to well-established principles, as it would defeat the very purpose of a proper control in a test-control experimental design in this matter – to isolate the causal effect of the challenged 'natural' claim on consumers' perceptions and/or preferences." Kivetz Report at ¶ 136. Not so.

67.    We followed a standard factorial design experiment that adheres precisely to well-established principles. The purpose of a proper control is to isolate the causal effect of the challenged "natural" claim on consumers' perceptions. We did this by editing the Product label to remove the claim "natural" from it. In addition, we create two additional conditions that 1)

represent the original Product label except for the editing of the brand name "One-a-Day" to reflect the fictional brand name of "First Choice," and 2) represent the original Product label except for the editing of the brand name "One a Day" to reflect the fictional brand name of "First Choice" and also remove the claim "natural" from the label. This is known as a 2 x 2 full factorial design. It allows us to 1) isolate the causal effect of the challenged "natural" claim, 2) isolate the causal effect of the challenged "natural" claim in the fictional conditions, 3) measure and test whether the impact of the "natural" claim differs, if at all, between the brand name condition and a fictional condition. This "interaction term" provides insights regarding whether the term "natural" has a similar effect for all brands or whether the effect for the One a Day brand was larger or smaller than the effect for a fictional brand. Our study did not find any significant differences across conditions.

68.     Finally, Dr. Kivetz claims, "It would be nonstandard and completely inappropriate for a researcher to use fictitious brands (in lieu of critical brand indicia) in order to 'control' for participants' preexisting beliefs in a survey designed to assess the causal impact of a challenged claim on consumers' perceptions." Kivetz Report at ¶ 136. Again, not so.

69.     In general, the use of fictional brands is quite appropriate in experimental research, is included frequently in top business journals, and allows for the testing of consumer perceptions regarding a product if one wants to avoid brand perceptions associated with any given real brand (*e.g.,* Rifkin et al. (2021) in the Journal of Marketing; Han et al (2021) in the Journal of Consumer Research; Costello & Malkoc (2022) in the Journal of Consumer Research).

70.     Furthermore, in addition to empirically testing any "brand name" effects in our scientific survey that followed best practices (as discussed above), we also control for both whether or not consumers had purchased the One a Day products before, and their frequency of purchase

23

of vitamins. This allows us to control for consumers' brand knowledge. In addition, we separately report results for prior purchasers of One a Day products to identify whether these consumers do have different perceptions compared to non-purchasers. Thus, we (1) correctly use appropriate methodology in our use of the fictional brand, and (2) also include information about consumers' familiarity with the One a Day brand.

71.    Therefore, our choice to use a fictious brand condition was appropriate, scientific, and useful in our study.

## VII. OUR SURVEYS' USE OF CLOSED-ENDED QUESTIONS WAS APPROPRIATE AND BASED ON ACCEPTED SURVEY PRINCIPLES AND PRACTICES

72.    Dr. Kivetz claims that, "contrary to accepted survey principles and practice," our perception surveys "inappropriately relied on a (sole) *closed-ended question* to assess consumer perceptions," Kivetz Report at ¶ 143 (italics in original).

73.    Dr. Kivetz's assertion that our use of closed-ended questions are contrary to accepted survey principles and practice is simply incorrect. Closed-ended questions have been established as a valid, scientific way of testing consumer beliefs and perceptions about many topics for decades (*e.g.*, Bradburn et al. 2004; Dillman et al. 2014; Reja et al. 2003; Schuman and Presser 1979; 1996; Schwarz 1999; Tourangeau et al. 2000). In fact, the use of closed-ended questions is more supportable than the use of only open-ended questions if one's goal is, as here, to obtain numeric data about a population. Closed-ended questions are used by the government to collect survey data on consumer sentiment and perceptions regularly (*e.g.*, the Annual Business Survey uses closed-ended questions https://www.census.gov/programs-surveys/abs/information.html). As noted in Diamond and Swann (2012), "Exceptionally influential in Federal Reserve deliberations, the Index of Consumer Sentiment is based entirely on the answers to five closed-ended questions, asked on a tracking basis, including, 'We are interested in how people are getting along financially

these days. Would you say that you are better off or worse off financially than you were a year
ago?' To the best of my knowledge, no one contends these closed-ended questions are leading or
biased." *Id.* at p. 269.

74.    Dr. Kivetz argues that allowing participants to provide their own, spontaneous
definition or understandings of "natural," as he does in his surveys, is a better survey methodology
than ours. Kivetz Report at ¶ 143. However, this is highly debatable.

75.    Dr. Kivetz's reliance on open-ended questions for identifying consumers' reasons
for purchasing a given product is problematic and results in an underestimate of the likelihood that
consumers rely upon the claim "natural" in their purchase behavior.

76.    In addition to the issues with the open-ended questions previously identified, by
asking consumers ahead of time what their considerations are when deciding what vitamins to buy,
Dr. Kivetz is priming them to consider their top-of-mind answers and then keep those in mind
when making the purchasing decision. In order to avoid cognitive dissonance (Festinger 1957;
Harmon-Jones & Mills 2019), consumers would be biased toward making decisions based on their
previous answers rather than due to any additional considerations that they see on the packaging.
If consumers do not think about whether the "natural" claim on the product is important to them
initially, then they may be less inclined to make a choice based on that factor when they see the
product.

77.    While open-ended questions are appropriate for identifying top-of-mind awareness
and answers that are salient and accessible, they are extremely poor at identifying answers that are
less obvious to consumers – but still important to them (*e.g.*, Schuman and Presser 1979; Reja et
al. 2003; Diamond and Swann 2012). Per Diamond (2011) in her seminal Reference Guide on
Survey Research, "Open-ended questions are more appropriate when the survey is attempting to

gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives" (p. 253).

78.    This quote is well-grounded in scientific literature. For instance, classic research conducted by Schuman and Presser (1979) found that when respondents were asked in an open-ended fashion what they thought was the most important thing for children to learn to prepare them for life, only 4.6% spontaneously indicated an answer of "To think for themselves." However, when this possibility was listed on a closed-ended question, 61.5% of respondents selected this answer (Schuman and Presser 1979). Similarly, many respondents may have valued products that contain only natural ingredients but may not have thought to include it in an open-ended answer. Per Diamond and Swann (2012), "Open-ended recall questions generally assess top-of-mind contents, while unbiased closed-ended recognition questions generally do a more thorough job of assessing what a person has stored in memory" (p. 270).

79.    Dr. Kivetz then claims, "As survey authorities note, in many cases, closed-ended questions have a disadvantage (compared to open-ended questions) because they give participants hints about answers that are expected or preferred." Kivetz Report at ¶ 144. He cites Diamond (2011) and Jay (2013) to support his point. What the cited references actually explain is that both closed-ended and open-ended questions can be leading if constructed poorly. The section of Diamond (2011) from which Dr. Kivetz is quoting ends with the statement, "Thus, the wording of a question, open-ended or closed-ended, can be leading, and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey." *Id.* at p. 252. Comparing bad closed-ended questions to good open-ended questions is unscientific and a poor strategy. And, in fact, the quote that Dr. Kivetz includes in his footnote that closed-ended questions increase the

likelihood of answers that "simply do not come to mind as easily" is an argument in favor of closed-ended questions, as we are interested in consumers' accurate perspectives and not just what is top of mind.

80.    While it is true that many courts may have preferred open-ended questions in the past, Diamond and Swan (2012) explain in great detail "why it was an error for courts to hold that because they were closed-ended questions (as opposed to other reasons), these questions were leading questions." *Id.* at p. 266. In fact, the survey methodology literature gives good reasons for why closed-ended questions were ultimately chosen to replace closed-ended questions when statistical extrapolation to a population is desired (Schuman and Presser 1979; 1996; Schwarz 1999). As such, we chose to follow scientific best practices in the design of our survey and therefore used well-constructed closed-ended questions.

## VIII. OUR SURVEYS QUESTIONS WERE NOT LEADING, NOT BIASED, AND NOT UNCLEAR

81.    Dr. Kivetz's claims that our perception survey's closed-ended question "was extremely leading, vague, and biased in favor of the Plaintiffs." Kivetz Report at p. 11; *see also id.* at ¶¶ 138-141. We, as experts in our field, obviously disagree. The closed-ended question used to assess consumers' perceptions about the ingredients mirrored the level of information presented to consumers in the marketplace. After all, Defendant does not define what "natural" means on its Product labels. Thus, our perception questions in both our initial and follow-up surveys  were constructed following best practices to be an example of a high quality closed-ended question that would be valid for obtaining correct, accurate, and precise estimates of consumer perceptions regarding the construct of interest (*i.e.*, whether consumers believed that ALL of the ingredients were natural, or that at least SOME of the ingredients were synthetic). We specifically avoid demand effects by including a distractor task before asking the relevant survey questions about the

multivitamin in question, and by wording each question following best practices of survey design.

82.    Dr. Kivetz claims that we provided "leading instructions." *See* Kivetz Report at ¶ 142. It is true that our instructions specifically highlighted the word "natural" to test group components. However, this was a correct and appropriate instruction because the purpose of the questions was to assess respondents' perceptions of the word "natural." Respondents cannot identify what they believe the "natural" claim means if they have not seen the "natural" claim. Similarly, it is impossible to accurately measure a concept without asking about it. This point is made at length by Jacob Jacoby in Chapter 12: "Are Closed-Ended Questions Leading Questions" in the seminal work, "Trademark and Deceptive Advertising Surveys" edited by Diamond and Swann (2012), which Dr. Kivetz has cited extensively and in which Dr. Kivetz is a coauthor on Chapter 11. Per Dr. Jacoby:

> "All questions necessarily lead respondents to think in terms of the subject matter posed by the question – sometimes, regarding issues the respondent might not have considered without being stimulated by the question. <u>That is the primary and necessary function of survey questions – to focus the respondent's thoughts on the issue of interest.</u> The alternative to asking questions that guide thought is for the questioner to stare at the respondent hoping that, somehow, someday, the respondent will spontaneously provide an answer to the question the researcher has in mind.

> <u>What makes a question a leading question is that it does more than cause a respondent *to think* in terms of the subject matter posed by the question; it also guides or biases the respondent *to answer* one way rather than another.</u> This can be accomplished in one of two general ways – either by making one or more responses (or response options) *more* likely to be selected than others, or by making one or more responses (or response options) *less* likely to be selected than others. All questions lead respondents to think; this does not make them leading questions. <u>It is only when a question leads you to *answer* one way rather than another that it is considered leading.</u> As the passages from authorities on legal evidence cited earlier indicate, when a (closed-ended or open-ended) question does not lead the respondent to select one *response* over others, it is not a leading question."

*Id.* at pp. 272-273 (underlining added, italics in original).

83.    We were specifically testing, in our prior and follow-up surveys, whether respondents' understanding of the ingredients differed when the word "natural" was included

versus when it was excluded from the packaging. Such questions accurately and precisely focus respondents on the phrasing about which the research question revolved. However, it does not lead respondents to be more or less likely to pick the answer, "only natural ingredients."

84.    Per Diamond and Swann (2012), "[i]t is only when a question leads you to answer one way rather than another that it is considered leading. As the passages from authorities on legal evidence cited earlier indicate, when a (closed-ended or open-ended) question does not lead the respondent to select one response over others, it is not a leading question." *Id.* at p. 273. In our surveys, we did not lead respondents to be any more or less likely to choose "only natural ingredients" compared to other answer choices. Respondents had a choice of three substantive answers: "only natural ingredients," "both natural and synthetic ingredients," "only synthetic ingredients," which were presented in a randomized order; as well as possible answer categories of "other," "don't know," and the "The product label does not communicate any information…" options.

85.    Contrary to Dr. Kivetz's position, Kivetz's Report at ¶ 151, our list of answer choices were complete and exhaustive. Any answer that respondents held to be true was associated with a possible response option in the question that was available for them to choose. Having a single construct about which a question is asked indicates a narrow and focused research question, not a leading one. There were multiple substantive ways in which consumers could have responded that did not align with the Plaintiff's position: that the product contained both natural and synthetic ingredients, that it contained only synthetic ingredients, as well as nonsubstantive responses of "other," "don't know," and "the product label does not communicate any information about the type of ingredients included."

86.    Dr. Kivetz notes, "as alleged in the Class Certification Motion, the challenged

'natural' claim allegedly communicates to consumers that the disputed products 'do not contain synthetic ingredients.'" Kivetz Report at ¶ 154. We therefore purposefully constructed the question to match the research question at hand, which is whether or not consumers actually believe that the disputed "natural" claim communicates to them that the Products do not contain synthetic ingredients. Even if consumers have differing interpretations of "natural," their specific understanding of that term, as well as the term "contain," "synthetic," and "ingredients," is not likely to bias our surveys. Bias refers to a systematic misrepresentation of the true answer in a population (either too high or too low). Drawing consumers' attention to a particular attribute (its ingredients) should not either cause more consumers to prefer a product that contains only natural ingredients or cause more consumers to prefer a product that contains both natural and synthetic ingredients.

87.    Any individual differences in interpretation of these words are more likely to contribute to random noise (variance) in the outcome rather than bias of the outcome, as there is no reason to think that any particular misconception of this phrase is both common and will lead to a higher percentage of consumers choosing "only natural ingredients" than would otherwise occur. Moreover, the results of our follow-up survey that tested consumer perception of the word "natural" in the context of a multivitamin bottle support the finding that the word "natural," on both multivitamin products generally and specifically on the Products, implies to a majority of consumers that such products contain only natural ingredients.

88.    Dr. Kivetz's assertion that our survey questions allegedly used a tautology, Kivetz Report at ¶ 154, is incorrect. First, the perception question itself did not include the word "synthetic." Second, the closed-ended answer options available to respondents included options for not only "Only natural ingredients" and "Only synthetic ingredients," but also an option for

"Both natural and synthetic ingredients." The existence of an answer that includes both attributes (i.e., natural and synthetic) would have allowed respondents to define the terms in a way that was not binary if they so desired.

89.     Dr. Kivetz states, "Asking direct questions (particularly closed-ended questions) about participants' opinions or perceptions can lead participants to guess and to answer based on what they can glean from the direct (closed-ended) questions and accompanying answer choices. Participants may select answers that appear to confirm the researcher's hypotheses, even when in the actual marketplace consumers do not form the perceptions highlighted by the survey's closed-ended question and answer choices." Kivetz Report at ¶ 147.

90.     In order to avoid this potential problem, we specifically included the quasi-filter option of, "The product label does not communicate any information about the type of ingredients included in the fruit bites multivitamins," as well as the answer categories of "Don't know," and "Other," in addition to the substantive answer options. Further, the question was designed to be objective and not lead people to disproportionately select the answer category "Only natural ingredients" compared to the categories, "Both natural and synthetic ingredients," or "Only synthetic ingredients." Only if individuals were led to select the answer category that was indicative of being confused ("Only natural ingredients") would the survey have been biased. They were not.

91.     Dr. Kivetz further claims that, "the list of answer choices in the 'perception' question was in fact highly incomplete, focusing participants on a narrow set of potential hypotheses that aligned with the Plaintiffs' (but not Bayer's) position. As Professor Diamond cautions, the results attained from closed-ended questions may be meaningful only if the list of choices is exhaustive (i.e., 'cover all possible answers a respondent might give'), and may

otherwise be misleading and biased." Kivetz Report at ¶ 149.

92.    We agree with Professor Diamond that the answer choices for closed-ended questions must be exhaustive. The definition of exhaustive answer options, however, is that they "cover all possible answers a respondent might give." This definition does not require a *substantive* answer for any response that a respondent might give. Our answer options do, in fact, cover all possible answers a respondent might give, including an "Other" option as well as a "Don't know" option, which collectively (along with the "The product label does not communicate any information…" answer category) give respondents a correct, accurate answer to choose from no matter what their perceptions are. In fact, the use of an "Other" category is specifically recommended in the survey literature as a "catch-all" to ensure that respondents who would not choose one of the substantive options offered to have a legitimate answer category choice (Biemer and Lyberg 2003). Dr. Kivetz's assertion that the inclusion of an "other" answer option (as well as the "The product label does not communicate any information…" option) is insufficient for rendering a set of answer categories exhaustive, Kivetz Report at ¶ 150, is nonstandard and contrary to the literature.

## IX.    OUR MATERIALITY STUDY WAS DESIGNED TO, AND DID ESTABLISH, MATERIALITY OF THE "NATURAL" CLAIM

93.    Our preference surveys discussed in our February 19 Report established materiality of that claim on consumer preferences for multivitamin products. Dr. Kivetz misrepresents and misunderstands the purpose of our consumer preference surveys, which did test materiality of the challenged "natural" claim. *See* Kivetz Report at p. 13 ("As Dr. Matthews admitted, her 'preference' surveys are not materiality surveys, as they do not measure how much consumers care about the challenged 'natural' claim.").

94.    Materiality does not need to measure ***how much*** consumers care about a challenged

claim, but instead needs to measure **whether or not** consumers care about a challenged claim. While we did not measure *how much* consumers care about the challenged "natural" claim in our preference surveys, we did measure *whether or not* consumers care about this claim, thereby demonstrating materiality.

95.     We succeeded in this task by holding all other potentially important factors constant and both assessing 1) whether or not consumers found the "natural" claim to be important in the Product label context, and 2) whether or not consumers believed it was important for a vitamin product to contain only natural ingredients compared to both natural and synthetic ingredients. In both cases, a majority of consumers preferred the "natural" option, and we correctly concluded from these results that the claims are each important to consumers.

96.     Further, our materiality study was more precise than Dr. Kivetz's studies, as ours isolated the importance of the challenged claim, whereas Dr. Kivetz's included many different attributes that might impact consumers' willingness to purchase. Therefore, it is unsurprising that his study failed to show a lack of significance, as it was likely underpowered.

97.     Dr. Kivetz also misrepresents and misunderstands the purpose of our preference surveys when he concludes that "the surveys simply do not assess the materiality of the challenged 'natural' claim. . . . because these two surveys did *not* in actuality test the *causal* effect of the challenged 'natural' claim on consumers' purchase decisions, per Plaintiffs' theory of deception." Kivetz Report at ¶ 184 (italics in original).

98.     In fact, we did assess whether the challenged "natural" claim matters to respondents at all by asking them which of two products they would prefer to purchase: the one with the challenged claim, or the one without. This is a scientifically valid methodology for assessing whether or not a given claim has any importance to consumers. If it were not important to

consumers, we would expect to see a 50% / 50% split across conditions. This is not what we saw. We then put forward a methodology for measuring the extent to which the "natural" claim matters relative to other attributes, and how much consumers would pay for a product that contains only natural ingredients, through a conjoint analysis.

99.     Dr. Kivetz complains that our preference surveys for our materiality study rely on ambiguous and unclear questions that did not explain or define terminology. *See*, *e.g.*, Kivetz Report at ¶ 185. However, the goal of our materiality study was to identify whether consumers prefer a product that contains a "natural" claim on the label versus one that does not. The survey question does not include tautologies, as the possibilities of products presented include a product, one with only natural ingredients and another product with both natural and synthetic ingredients.

100.     Our materiality study was designed to, and did, identify whether or not the challenged "natural" claim, in isolation, was important to consumers. It was. Our materiality study also laid the foundation for a future price premium analysis.

## X.     OUR MATERIALITY PREFERENCE SURVEYS APPROPRIATELY FOCUSED CONSUMERS ON THE WORD "NATURAL"

101.     Dr. Kivetz argues that our surveys "grossly violated marketplace conditions," that they are "highly contrived," and that they artificially focused participants' attention on "natural." Kivetz Report at p. 12; *id.* at ¶¶ 165-184. This argument fails to acknowledge that no survey, including Dr. Kivetz's surveys, can precisely replicate marketplace conditions. Much high-quality research is to some extent contrived and artificial in order to focus on the variables of interest to the study. This does not render them unable to speak to the attitudes, perceptions, and behaviors of people in real-world contexts. Although Dr. Kivetz disagrees with our design choices, our survey designs - in the perception study discussed in the February 19 Report, the perception follow-up study in this Reply Report, and the materiality study discussed in the February 19 Report - were

appropriate, following best practices.

102.    I am a survey methodologist and academic marketing researcher and always seek to present consumers with questions and experimental stimuli that are most representative of their experience. As a methodological expert, I carefully design my stimuli across different surveys to reflect best practices for the research question at hand. There is a large difference between interpreting claims made by a label (a perception survey) – a context in which one desires to reflect marketplace conditions – and identifying whether consumers prefer one of two identical products that only differ in one feature. As such, my decisions are scientifically defensible – and in fact, reflect best practices.

103.    At bottom, Dr. Kivetz disagrees with our design choices but does not identify any inherent flaws in our survey design.

104.    For example, Dr. Kivetz incorrectly states that, our presentation format "is a textbook example of a leading question that gives rise to a severe demand effect and focalism bias." Kivetz Report at p. 12; *see also* Kivetz Report at ¶¶ 138-39;164, 174.

105.    Dr. Kivetz mistakenly conflates asking respondents about an issue with leading respondents to a desired answer. Demand effects are only relevant when the question or survey lead respondents to identify the answer that the researcher "wants to see" and then give that answer. Our question wording is designed carefully to not point respondents to either one of the answers as being better than the other. Further, by using a set of distractor questions earlier in the survey, we guide respondents away from believing that the survey is for litigative purposes. As such, there is no reason to believe that respondents would identify one position or other as the "correct" answer based on the question or the questionnaire.

106.    Further, focalism bias is entirely irrelevant for questions that ask consumers about

their preferences within one specific attribute. Focalism bias may be relevant in questions that seek to test the *relative importance* of different attributes to consumers' product choice. If, for instance, a researcher asked respondents what their favorite color is and then gave them options for "red, orange, yellow, green, blue, purple, other, none of the above," the researcher would be focusing the respondent on the topic of "favorite color," and yet the question would not suffer from focalism bias.

107. In contrast, if the researcher first asked respondents the above question and then presented two products that BOTH varied in color AND varied *on other attributes that might be relevant to purchase decisions* (*e.g.*, price, flavor), then it would be possible that a respondent may place undue importance on color when making a final product selection because their attention had been drawn to that attribute. In the above example, since the researcher had focused the respondent on color and then asked them to make a purchase choice that included attributes OTHER than color, focalism bias might occur. However, there is no chance for focalism bias to occur if one is specifically asking respondents to make a choice solely about the topic that is being raised in the question. The preference questions asked in our survey only asked consumers about one specific topic, which was raised in the question. Therefore, they cannot be subject to focalism bias.

108. Dr. Kivetz also takes issue with the lack of packaging stimulus when participants were told to "imagine" a hypothetical shopping scenario in which they are asked to choose between two (unspecified) brands of multivitamin dietary supplements. Kivetz Report at ¶¶ 166-80.

109. In the preference surveys, we told consumers that the two products were identical in every way except for one attribute: whether or not it was labeled as "natural." Since consumers were asked to select between products that were identical except for their "natural" label, there

was no need to include packaging stimulus, such as the "Supplement Facts" panel, because it would have been identical across both products other than the tested attribute. When designing experimental stimuli in consumer research, it is best practices to design one's stimulus to not present extraneous information to consumers – especially when that information would be held constant across conditions. This is done to avoid cognitive overload of consumers.

110.    Dr. Kivetz's critiques about consumers' real world purchase experiences, Kivetz Report at ¶¶ 166-83, completely miss the point of the preference questions, which were to establish baseline preferences for multivitamin products in general that contain only natural ingredients compared to those that contain both natural and synthetic ingredients. Our survey succeeded in its goal. Packaging and brand context for this part of the study are irrelevant to the question at hand.

111.    Our study was properly focused and narrow, as its goal was to identify, holding all other variables constant, whether or not consumers had a preference for vitamin products that 1) are labeled "natural" versus not labeled "natural," and 2) contain only natural ingredients versus containing both natural and synthetic ingredients. We were not attempting to measure consumers' purchase intentions in the marketplace while accounting for all possible factors that might impact purchase intentions. We were attempting to, and succeeded in, identifying whether or not a given attribute is important to consumer purchase decisions in isolation. This valid foundation would be built upon by a properly conducted price premium conjoint analysis in the future. The study was successful in its objectives.

112.    Also, it is factually incorrect to insinuate that the question prevents consumers from indicating that they would "not make any purchase" when given the choice between the multivitamins. *See* Kivetz Report at ¶ 172. As explicitly discussed in the February 19 Report, the set of options available to respondents in the survey included a "would not purchase either" option.

113.    Dr. Kivetz also misrepresents what survey bias is. *See, e.g.,* Kivetz Report at ¶ 172. It was not biased or leading to draw respondents' attention to the word "natural," as the goal of the study was to identify whether consumers prefer vitamin products that 1) are labeled "natural" versus not labeled "natural," and 2) contain only natural ingredients versus containing both natural and synthetic ingredients. It is not biasing to raise a topic in consumers' minds. "Focalism bias" is irrelevant when one is simply seeking to ascertain whether consumers have any preference between one of two different options. It would be relevant in cases where a price premium is being sought, which is why one needs to include more than the single attribute in question in a study design when measuring a price premium conjoint survey. But that is not the case in the question here. Bias refers to a systematic misrepresentation of the true answer in a population (either too high or too low). Drawing consumers' attention to a particular attribute (its ingredients) should not either cause more consumers to prefer a product that contains only natural ingredients, or cause more consumers to prefer a product that contains both natural and synthetic ingredients. As such, the question is not biased.

114.    If consumers did not find the attribute to be at all important, then we would have expected to see a roughly 50% / 50% split between consumers indicating that they would purchase the one that contained only natural ingredients versus both natural and synthetic ingredients. If consumers valued synthetic ingredients more than natural ones, all else being equal, we would have expected to see less than 50% of consumers choosing the "only natural ingredients" option. However, this is not what we saw. In fact, a strong majority of consumers, including past purchasers of One a Day products, preferred the multivitamin product that was labeled as "natural" and that contained "only natural ingredients" when all other attributes of product were held constant. This finding indicates that consumers find these attributes important.

## XI. OUR MATERIALITY STUDY FOLLOWS SCIENTIFIC BEST PRACTICES AND RESULT IN ACCURATE, PRECISE, USEFUL DATA

115.    Dr. Kivetz makes several inaccurate claims about several aspects of our preference surveys, which demonstrated materiality. First, he inaccurately states generally that our preference surveys are "fatally flawed, fundamentally leading, and incapable of providing any probative evidence that the challenged 'natural' claim was material to consumers' purchase decisions." Kivetz Report at p. 12.

116.    The preference surveys are not fatally flawed, as they were instead conducted following scientific best practices. They are not fundamentally leading, as neither the survey question wording nor design drew respondents to answer one way versus another way. The surveys are capable of providing probative evidence that, holding all else constant, there is 1) a strong consumer preference for a Product that says it is "natural" compared to one that does not, and 2) for a general multivitamin product that contains only natural ingredients compared to one that contains both natural and synthetic ingredients. From these two preference surveys together, we can conclude that the term "natural" is important to consumers, holding all else constant, and that the definition of "natural" that is relevant to this case (i.e., does not contain synthetic ingredients) is important to consumers, holding all else constant.

117.    Dr. Kivetz then claims that our analysis approach with regard to the reporting of our materiality descriptive statistics and confidence intervals is "inappropriate," "nonstandard," and "unscientific" as we chose to exclude from analysis participants who indicated that they would not purchase either of the multivitamin products or that they "didn't know" which option they would choose. *See* Kivetz Report ¶ 124.

118.    Dr. Kivetz's assertions are incorrect. "Don't know" responses have been historically treated as either "invalid responses or as nonresponse" (Young 2012, dissertation;

Krosnick et al. 2002; Groves et al. 2004; Converse 1976). Both invalid responses and nonresponses are often dropped from analysis in scientific studies.

119.    Statistically and logically, it is also quite reasonable to drop "don't know" responses in this context. Logically, a "Don't know" option in this question is a nonsubstantive option that would either lead to individuals making one of the following choices between the two products available: they would 1) not purchase either of them, 2) purchase both products, or 3) make a random choice between the two. Any of these decisions would not change the percentage of individuals in the population who would systematically prefer one option over the other. If individuals would opt for not purchasing either, then they would fall in the same category as those who said they would not purchase either, addressed below. If a researcher categorized them as preferring both A and B, that categorization would be statistically incorrect as it would double-count their opinions and artificially increase the statistical power of the study. If they made a random choice between the two options, then one could randomly assign half of the individuals who picked "don't know" to one option and half to the other, but that would have the same numerical outcome as excluding those who said that they "didn't know." As such, we choose to exclude these nonsubstantive answers and clearly explain that we are reporting the preferences of those who don't say "don't know."

120.    We also choose to drop individuals who indicate that they would not purchase either product. This option is a quasi-filter question intended to remove from sample any individuals for whom the question is irrelevant. Diamond (2011) indicates that the use of a "quasi-filter" method of presenting all options to choose from in a single closed-ended question is preferred compared to a full-filter question asked ahead of time to both minimize under-reporting and over-reporting of substantive answers. As Dr. Kivetz pointed out in his comment regarding the universe of

interest, it is relevant that we do not force individuals who would not choose to purchase a multivitamin to make a choice between two such products. As such, we specifically choose to allow individuals to say that they would not purchase either product. Individuals who would not choose to purchase a product, however, are not relevant for inclusion in a discussion regarding what percentage of individuals would prefer one attribute over another – the discussion is predicated on the assumption that individuals are, in fact, interested in purchasing a product of the given sort. It is therefore reasonable and statistical best practice to exclude from the analysis any individuals to whom the question does not apply, including those who would not purchase either version of the product.

121.    However, even if we include individuals who say they would not purchase either product, or that they don't know, we find that 69.5% of consumers in condition 1 and 71.6% of consumers in condition 2 in the "Product preference" survey would prefer to purchase a Product that indicated that it was "natural" compared to one that did not. We similarly find that 71.6% of individuals in condition 1 and 60.6% of individuals in condition 2 in the "General preference" survey would prefer to purchase a multivitamin that contained only natural ingredients compared to one that contained both natural and synthetic ingredients. Therefore, even if we follow Dr. Kivetz's methods of calculating percentages, our conclusions in the report that a "majority of consumers" would rather purchase multivitamins that contain only natural ingredients, and our conclusions therefore that this product attribute is important to consumers, remain unchanged.

122.    Dr. Kivetz next critiques our within-subjects design, in which we explicitly ask consumers to choose between two versions of a product, rather than the between-groups design used by Dr. Kivetz, where consumers only see one version of a product.

123.    Dr. Kivetz's argues that the expected response to our within-subjects survey design

is obvious. *See* Kivetz Report at ¶¶ 181-82. If so, Dr. Kivetz is agreeing with our hypothesis and our empirical findings that, indeed, a majority of consumers indicate that they prefer multivitamin products that contain only natural ingredients. If he is concerned about cognitive biases, then his concerns should be alleviated by the fact that 1) we counter-balanced the order in which responses were shown to prevent order effects, 2) used a self-administered mode to minimize the possibility of self-presentation and impression management biases, and 3) used balanced and objective wording in describing the product options so as to not indicate in the question wording that one was to be preferred rather than the other.

124.    As an illustration, one can consider an equivalently worded question for an attribute that has no "obvious" correct answer according to respondents. If we had asked respondents to consider two identical products that only differ in one way, namely, that one includes "only red ingredients," and the other of which contains "both red and blue ingredients," and then asked respondents whether they would choose the one that contains "only red ingredients," "both red and blue ingredients," "don't know," or "would not purchase either," it should be clear that there is no "correct" answer to this question, that the hypothesis is not obvious, that the question is not leading, and that it is not subject to bias. This indicates that Dr. Kivetz's problem is *not with the question itself*, but rather with the fact that, as we find in our reliable, valid survey, consumers do tend to prefer products that are made with only natural ingredients.

## XII.  SURVEY CONTROLS ARE UNNECESSARY FOR DESCRIPTIVE STUDIES

125.    Dr. Kivetz's tries to argue that, "[t]he absence of a control condition (stimulus) or control question means that these surveys lacked any benchmark or means to account for the survey 'noise' generated by factors such as participants' preexisting beliefs, guessing behavior, and the survey's numerous severe biases." Kivetz Report at 13. *See also id.* at ¶¶ 197-201.

126.     Dr. Kivetz makes two separate mistakes when assessing our survey experiment. First, as he later notes in his report, we used a within-groups experimental method to assess consumers' choice preferences. As such, the control condition (stimulus) present in the question is, in fact, the Product label that contains the word "natural," or the product option that is made with "only natural ingredients." This is a valid experiment for identifying whether or not a given attribute of a product is important to consumers, while holding all other product attributes constant. We do randomize the order in which the stimuli are presented as an appropriate method of preventing order effects.

127.     Second, the results from a choice task such as the within-groups experiment that we ran are always going to result in a percentage of people who prefer a given attribute over another. Our goal is to identify what this percentage is in the population, which is by nature a descriptive rather than a causal research question. As such, we followed proper research procedure and study design to answer a descriptive research question. This includes taking steps to create and design a survey that will minimize the error due to survey "noise," as is laid out in the survey methodology literature. An entire academic field of survey methodology exists regarding how to create questionnaires that can most accurately, validly, and reliably obtain point estimates of any construct that one wishes to measure. We follow this literature in creating our survey questions. Because it is true that all surveys have some level of "random noise" inherent in their answers, it is correct to report confidence intervals around any results obtained. We do this for all of our point estimates in our report, thus accounting for the random survey "noise" generated. As previously discussed, our questions are not biased and the answers from them can be used as reliable point estimates for the population.

128.     Dr. Kivetz also misapplies a quote from a treatise on best practices when he writes,

"Survey treatises and authorities have provided extensive commentary on the necessity of survey controls in deceptive advertising surveys, while cautioning against survey designs that lack, or use inadequate, controls. In both litigation and academic contexts, studies that fail to employ adequate controls are often rejected or excluded for that reason alone. One survey treatise author, Jerre Swann, characterizes a 'survey without a control cell or with a fundamentally inadequate control stimulus' as one of two '[...] flaws that should lead to survey exclusion without extensive analysis or data,' and further writes:

> Nonetheless, surveys are still offered without a control cell or with a fundamentally inadequate control stimulus, and such surveys should be excluded or (in a bench trial) wholly discounted. One criterion for survey admissibility is that it have a known error margin, and without a scientific design and a defensible control stimulus, a survey cannot satisfy the reliability mandate."

129.    This quote is taken from a book (Diamond and Swann 2012) that describes best practices for trademark and deceptive advertising surveys (the title of the book is, in fact, "Trademark and Deceptive Advertising Surveys: Law, Science, and Design,") that are designed to test consumer *perceptions*. The first paragraph of this book explains its scope: "Are consumers likely to be confused as to the source of a trademark or likely to be deceived by a commercial message? How can we know unless we examine consumer reactions?" (p. 3). This consumer deception research question is the context in which they, rightly, identify that any surveys that seek to measure the impact of a particular claim on consumer perceptions without assessing consumer perceptions when presented with a correct claim is fatally flawed.

130.    However, our preference studies were not attempting to assess consumer perceptions and do not fall into the category of research being discussed in this quote. While it is technically experimental work (a within-groups experiment) because it asks consumers which of two products that are identical but for one factor they would prefer, and counterbalances the order in which the options are shown, it asks a descriptive rather than causal question by nature (i.e.,

"what percentage of consumers find this attribute to be important?") and so follows survey research best practices akin to those used by governmental researchers who design instruments such as the U.S. Census to obtain precise, accurate estimates of what is true in a population. (Indeed, the academic and professional organization AAPOR, to which I belong and whose research I follow and have contributed to, is the professional organization for all such survey researchers and methodologists.)

131.    If the experimental standard described above by Diamond and Swann were applied to all survey research, as Dr. Kivetz seems to be mistakenly implying, it would automatically discount any surveys conducted without a control condition – including work such as the U.S. Census (census.gov), American Community Survey (https://www.census.gov/programs-surveys/acs), American Housing Survey (https://www.census.gov/programs-surveys/ahs.html), Annual Capital Expenditures Survey (https://www.census.gov/programs-surveys/aces.html), and other surveys conducted by the government and provided by the government as data – from inclusion in any court of law. Unless Dr. Kivetz believes that such reputable sources as Diamond and Swann are seeking to exclude all such survey evidence from the legal courtroom, he must admit that his conclusions are overbroad.

132.    Causal research and descriptive research are designed for different purposes. The two methods therefore follow different procedures to obtain accurate outcomes. The goal of descriptive research is to use a sample to numerically describe what is true in a population. The goal of causal research is to identify how a particular independent (causal) variable impacts a dependent (outcome) variable. Both descriptive and causal procedures can be followed in the same study, which results in outcomes that meet the criteria for accurate, precise descriptive estimates as well as allow for tests of the causal nature of outcomes. In my survey, all components of the

research instrument first and foremost follow descriptive research best practices as outlined in, for instance, Biemer & Lyberg (2003), Dillman et al. (2014), Shadish et al. (2002), Tourangeau et al. (2000), and Groves (2005) A question such as, "what percentage of all consumers would prefer to purchase A versus B if given the choice?" is inherently a descriptive question. The result should be a percent with a confidence interval that gives a precise, accurate, reliable estimate of what is predicted to be true in the population of interest based on the results from the sample, if proper procedure is followed to collect data that are accurate and unbiased, as we did.

133.    Dr. Kivetz also misidentifies the purpose of my study in his statement,

[I]t is inexplicable that Dr. Matthews chose to use a "test-control" experimental design to assess consumer perceptions, yet opted not to use this same methodology to assess consumer preferences both of which relate to causal questions in this litigation. Instead of following the above standard scientific methodology in her "preference" surveys, Dr. Matthews asked participants to compare and choose between two products on the basis of a single factor, while failing to include any survey control and providing no other attributes against which participants could trade off the relative importance of "natural." In the real world, some consumers may not care about whether a multivitamin is described as "natural" or not, so long as the vitamins are efficacious and have a palatable taste; others may realize that many vitamin supplements or nutrients are made in a laboratory setting or involve chemicals and processing; and still others may not care about "natural" so long as a certain percentage of ingredients (e.g., 50% or more) are "natural." However, when asked in a vacuum-divorced from any consequences, tradeoffs, context, or comparisons-whether they would prefer to purchase a product labeled as "natural" over one not labeled as "natural," such survey respondents would nevertheless be likely to simply respond that they would prefer the former.

Kivetz Report ¶ 192 (emphasis removed).

134.    Dr. Kivetz is incorrect in his statement that the preferences survey is asking a causal question akin to that tested by the perception survey. Instead, the question of "which of these two options do consumers prefer, if given the choice?" is inherently a descriptive question of the type that is collected via non-experimental survey research on a regular basis by marketing research companies. It is true that consumers may not care whether or not a vitamin is described as "natural" – if this is true in a vacuum, we would expect to see a 50% split for consumers indicating that they

prefer a vitamin described as "natural" in our survey.

135.    However, this is not what we see, as consumers expressed a strong preference for products labeled as "natural." Since consumers do prefer vitamins labeled as "natural," we can conclude that this contested claim is important to consumers.

136.    Dr. Kivetz again misuses the term "leading" and misrepresents the purpose of our study when he writes, "Rather than conducting a 'between-subjects' survey in which half of the participants view an allegedly deceptive 'test' package and the remaining half views a non-allegedly deceptive 'control' package prior to indicating their purchase preferences, Dr. Matthews created a highly leading purchase intention question that does not even isolate the specific alleged misperception on which the Plaintiffs' theory depends." *Id.* ¶ 194.

137.    As previously stated, we were assessing the extent to which consumers preferred a product that contained only natural ingredients compared to one that did not, and a Bayer One a Day product that was labeled as "natural" compared to one that did not, all else held constant. This choice task necessitated asking consumers about both conditions, in a within-groups type experimental design. We therefore did not ask a traditional purchase intention question, which is designed to assess consumers' likelihood of purchasing a given product in the marketplace, typically measured as a 5 or 7-point scale that asks, for a given product, whether consumers would "definitely not purchase" (1), "probably not purchase" (2), "might or might not purchase" (3), "probably would purchase" (4), or "definitely would purchase" (5) this product. Such a purchase intention question would have been inappropriate given that our research goal was to identify which of two options, all else held equal, consumers would prefer in a given product.

138.    Dr. Kivetz also, again, falsely identifies the purpose of my study when he states, "Another fundamental principle is that a study designed to test for the effect of a variable (e.g. a

packaging or advertising claim) on consumers' perceptions or preferences (and other such cause-effect experiments) must include a proper control…. The control stimulus should be as similar as possible to the test stimulus but for the alleged deception at issue."

139.    The methods that Dr. Kivetz describes are, as he indicates, appropriate for "a study designed to test for the effect of a variable…on consumers' perceptions or preferences (and other such cause-effect experiments)." However, the described methods are *not* appropriate for the type of study that we conducted here. Instead, we conducted a descriptive survey study (with a counterbalanced experimental component to prevent order effects and allow consumer choice between two options) designed to identify a point estimate in a sample of the percent of consumers who would prefer one attribute over another, holding all else constant, and then to extrapolate that point estimate to the relevant population. It is true that surveys must be properly designed to guard against bias, as Dr. Kivetz notes. This is why, as a survey methodologist, I follow the extensive literature in survey design to minimize the likelihood of bias in the surveys I design. Explanations pertaining to bias, and why our questions are not biased, are provided throughout this Reply Report.

140.    Dr. Kivetz incorrectly defines descriptive statistics in the context of survey research when he writes,

> Dr. Matthews subsequently suggested at her deposition that her 'preference' surveys were intended to 'assess descriptive statistics about a population' and were not designed as experimental studies 'to identify the impact of a causal variable.' Beyond the fact that consumers' preferences and purchase intentions are not equivalent to 'descriptive statistics' and therefore require a proper control mechanism, Dr. Matthews's testimony is an admission that her 'preference' surveys cannot (causally) attribute participants' responses to specifically the presence or absence of the challenged 'natural' claim. Inexplicably, Dr. Matthews also testified that reversing the order in which the two products appeared served as a control condition. This assertion is unsubstantiated and erroneous: While counterbalancing the order in which stimuli, questions, or answer choices appear can account for (or 'control for') order effects, this practice in no way substitutes for a survey control.

Kivetz Report ¶ 200 (Emphasis removed.)

141.    Dr. Kivetz, as an experimental researcher, fails to correctly define the use of the

term "descriptive statistics" in this context. In experimental research, "descriptive statistics" refer

to basic demographic information about one's sample that is extraneous from the actual variables

that one is testing. In contrast, survey methodologists define "descriptive research" as research that

seeks to accurately obtain a point estimate of what is true in a population using numbers, and

"descriptive statistics about a population" as the resulting point estimates (including confidence

intervals) that result from this descriptive research. One may obtain descriptive statistics for a

population regarding any phenomenon of interest, including consumer attributes, attitudes, and

expected behaviors, using descriptive survey research.

142.    As previously discussed, the goal of the preference survey was to assess consumers'

stated preferences for one product versus another that only differed in one attribute: whether it was

labeled as "natural" or not (Bayer Preference), or whether it contained "only natural ingredients"

or "both natural and synthetic ingredients." Our survey obtained accurate point estimates and

confidence intervals to be able to extrapolate to the population the answer to this descriptive

research question.

143.    Dr. Kivetz also inaccurately writes,

> The failure to include any (external) control stimulus or (internal) control question
> is a fatal flaw in the Matthews "Preference" Surveys, rendering their results
> fundamentally uninterpretable, unreliable, and unscientific. Dr. Matthews provides
> no explanation or justification for this critical omission. The absence of any control
> guaranteed that no meaningful correction can be made for the "noise" arising from
> the Matthews 'Preference' Surveys' (inherent) acute one-sided biases. Therefore,
> these two surveys simply cannot be used to derive any valid conclusions about
> consumer purchase decisions.

Kivetz Report ¶ 201.

144.    Dr. Kivetz's conclusions are inaccurate, as they are applying standards of

experimental causal research to a descriptive survey (that contained experimental counterbalancing to prevent order effects and the use of identical products that only varied in one attribute to allow for consumer choice). Throughout our February 19 Report, I described the goal of these studies as assessing consumer preferences for one of two options, which is inherently a descriptive question. In the February 19 Report's conclusion, I state that our survey provides a "valid and reliable estimate of the perceptions of purchasers of multivitamin dietary supplements with regard to … (2) preferences for multivitamin dietary supplements that contain only natural ingredients compared to natural and synthetic ingredients, and (3) preferences for Bayer One a Day Fruit Bites Multivitamins that contain the word "natural" versus Bayer One a Day Fruit Bites Multivitamins that do not" February 19 Report at ¶ 192. We followed proper survey methodology to construct a survey that minimizes the likelihood of bias. Dr. Kivetz's assertions that the surveys contain "(inherent) acute one-sided biases," Kivetz Report ¶ 201, are incorrect, and these surveys' results can be used to make accurate and precise predictions to the population that the sample represents.

## XIII. AN APPROPRIATE CONSUMER UNIVERSE WAS USED

145.    Our population was properly chosen and defined. We defined our population as adult US individuals 1) who were at least 18 years of age, 2) who were residing in the United States, and 3) who had purchased vitamin dietary supplements at least once in the past 12 months for their personal use. Our goal was to assess what "reasonable consumers" perceived about the product, and their preferences for products with different labels or ingredients. We controlled for region of the country and found no significant differences in either consumers' perceptions of or preferences for vitamin products based on region.

146.    Therefore, our entire sample can be accurately used to represent the opinions and

perceptions of both California and New York consumers, as our results identify no differences by region in how consumers either interpret a label claim or their preferences for products that are labeled as "natural" or only contain natural ingredients.

147.    Dr. Kivetz's assertion that we "failed to represent the relevant consumer universe" by using a national sample instead of a sample drawn from just California and New York residents, Kivetz Report ¶ 128, is not valid. Unless California and New York consumers are fundamentally different from other national consumers in their perceptions of and preferences for ingredients of one type versus another, of which there is no statistical evidence in our study, a national sample is reasonable for assessing what "reasonable consumers" believe. We did use a national sample rather than a sample of only California and New York consumers, as we did not (and do not) believe that consumers who live in a particular region of the country are significantly different in how they interpret labels or in their product preferences compared to individuals who live elsewhere in the country. We empirically tested these hypotheses by including a demographic "region" variable in our logistic regression analysis, and found no statistically significant differences in either consumer perceptions or preferences based on region of the country. Therefore, our survey accurately represents the perceptions and preferences of "reasonable consumers" in California and New York, as well as other areas of the United States and we can reasonably conclude that California and New York consumers are similar in their perceptions of and preferences for natural ingredients in multivitamins. Although we present these results in our analysis, for some reason Dr. Kivetz specifically does not address our multivariate analysis and results in which we discuss the above.

148.    Dr. Kivetz incorrectly argues that our survey universe—U.S. adults who purchased in the category within the past year—was improper. *See* Kivetz Report at p. 14 It is true that our

universe excludes prospective or first-time purchasers in the category. However, since the putative

class includes only individuals who have actually purchased vitamin dietary supplements, it would

be inappropriate to include individuals in our sample who had not purchased these products.

Instead, we promote external validity by making sure that all sample members have actually had

experience with purchasing the product category. We also control for frequency of purchase, so as

to identify whether individuals who are more or less experienced with making purchase decisions

are any different in their perceptions of or preferences for ingredients of a particular sort. (We also

find that this variable is nonsignificant in predicting either confusion levels or preferences.)

149.    It may also be true that our universe might contain some consumers who do not

currently intend to purchase vitamins. However, 1) this should not impact their perceptions of the

type of ingredients found in a multivitamin and so should not bias the perception survey, and

reflects the nature of the class as those who have previously purchased vitamin supplements rather

than those who intend to do so, and 2) we allow respondents to indicate in the preferences portion

of the survey that they would not purchase either, and so we allow them to screen themselves out

of that component of the study.

150.    Additionally, this is an odd critique for Dr. Kivetz to make because his own

materiality surveys chose to screen only for individuals who indicated that "they had personally

purchased in the past twelve (12) months an '[a]dult multivitamin'". Kivetz Report at 21. Dr.

Kivetz should either follow his own advice or recognize that the above concern is contrived and

not serious.

## XIV. USE OF QUASI-FILTER METHOD AND OTHER RAISED ISSUES

151.    Dr. Kivetz states, "The "perception" question, which abruptly introduced the idea

of a multivitamin containing "natural" versus "synthetic" ingredients, was not preceded by any

(full) filter question to screen out participants who did not think about such a concept in the first place." Kivetz Report at 11.

152.    We followed best practices according to Diamond (2011) in using a quasi-filter method in our survey. Per Diamond's Reference Guide on Survey Research (p. 251) (emphasis added):

> In general, then, a survey that uses full filters tends to provide a conservative estimate of the number of respondents holding an opinion, whereas a survey that uses neither full filters nor quasi-filters tends to overestimate the number of respondents with opinions, because some respondents offering opinions are guessing. ***The strategy of including a "no opinion" or "don't know" response as a quasi-filter avoids both of these extremes.*** Thus, rather than asking, "Based on the commercial, do you believe that the two products are made in the same way, or are they made differently?" or prefacing the question with a preliminary, "Do you have an opinion, based on the commercial, concerning the way that the two products are made?" the question could be phrased, "Based on the commercial, do you believe that the two products are made in the same way, or that they are made differently, or don't you have an opinion about the way they are made?"

153.    In other words, including a "don't know" options as well as an option stating, "The product label does not communicate any information about the type of ingredients included in the fruit bites multivitamins" in our closed-ended response list uses the above recommended quasi-filter method that is appropriate to avoid overestimating or underestimating consumer opinions for this type of question.

154.    As previously noted, Diamond (2011) – the same resource that Dr. Kivetz argues from here – actually concludes that quasi-filter questions such as the ones we use in our survey avoid both the extremes of overestimating or underestimating the number of individuals with opinions, and so are a scientifically valid and even recommended method for filtering out participants who have no opinions (p. 251). In contrast, according to Diamond (2011), the full-filter method as advocated by Dr. Kivetz can result in too conservative an estimate of the number

of respondents who hold a particular opinion (p. 251).

155.    Dr. Kivetz also misreports what is stated by academic literature when he writes,

Contrary to Dr. Matthews's assertion at her deposition, scientific research has found that considerable proportions (i.e., typically between 50% and 75%) of consumers are aware of, search for, review, and use nutrition/supplement facts and ingredients list appearing on packaged food products. For example, in a 2019 survey conducted by the FDA, 87% of Compare eye-tracking participants reported having looked at the Nutrition Facts label on packages; 72% indicated that they are 'interested in the Nutrition Facts label';and 71% indicated that the '[i]nformation on the Nutrition Facts label is useful' to them.

Kivetz Report ¶ 91

156.    The statement I made in my deposition related to consumers' typical practices during shopping. It is accurate and based on scientific research (e.g. Bartels et al. (2018); Christoph et al. (2018); Graham et al. (2015)). Many scientific studies have been conducted on the topic of whether or not consumers look at Nutrition Facts labels, each of which approaches the question of food labels slightly differently. In my deposition, I was relying on studies such as Bartels et al (2018), which found, using eye-tracking, that only 28% of consumers viewed the Nutrition Facts label on the back of a package while shopping, and Christoph et al. (2018) which found that 31.4% of a survey sample "reported using Nutrition Facts labels, which was defined as using them 'most of the time' and 'always' when buying or choosing a food product for the first time."

157.    In contrast, Dr. Kivetz's reports of the literature are overstated and contain errors. For instance, while he claims that in the FDA survey above, "87% of Compare eye-tracking participants reported having looked at the Nutrition Facts label on packages," there was no eye-tracking used in this study. In fact, the word "eye-tracking" does not appear anywhere in the 76-page report. Instead, this survey study asked respondents, "Do you ever look at the Nutrition Facts label on food packages," to which 87% of respondents said, "Yes." There is no contradiction between a finding that 87% of respondents "ever" look at Nutrition Facts panels (Landy et al.

2021), and that 31.4% of them use Nutrition Facts panels "most of the time" and "always" (Christoph et al. 2018). However, the question at hand in this matter is what most people do on any given shopping occasion, not whether they ever look at Nutrition Facts labels. I therefore stand by my statement that a majority of consumers do not tend to look at the back of food labels in any given shopping trip.

158.    Although Dr. Kivetz claims that there was "no reason" to run this design as a single experiment rather than three separate studies, Kivetz Report at p. 66, n. 198, there were several very good reasons to do so. First, his suggestion to instruct the panel "to exclude from participation any respondents who started one of the surveys from the other surveys" is more complex than simply allowing all respondents to take the same survey and randomly assigning them to different conditions. In addition, our methods ensure that respondent random assignment stays within the researcher's control rather than outsourcing this crucial component of the research process to the data collector. Finally, for logistics reasons, running the study as a single survey meant that there was only one contract to sign, only one project to manage, only one set of correspondence regarding setup and fielding to engage in, only one survey to pretest, and only one dataset to analyze. This all resulted in efficiencies that saved time and resources – which I believe are excellent reasons to conduct one survey rather than three separate surveys.

159.    Dr. Kivetz statement our February 19 Report "did not report the full distribution of responses to the key closed-ended questions in each of the three surveys," Kivetz Report ¶ 124, is categorically false. We provided the univariate distribution of responses in our appendix starting on page 116 of our report, titled, "Appendix: Output Results." For instance, we report on page 120 the results of the variable "dec_bayer_A" which we clearly discussed on page 119 in terms of its question wording and coding, which indicates a distribution of 55 individuals giving the answer

coded "1" (only natural ingredients), 31 individuals giving the answer coded "2" (both natural and

synthetic ingredients), 1 individual giving the answer coded "77" (other), 5 individuals giving the

answer coded "88" (don't know), and 7 individuals giving the answer coded "99" ("The product

label does not communicate any information about the type of ingredients included in the fruit

bites multivitamins.").

160.    Dr. Kivetz also, again, misrepresents the scientific underpinnings of our study when

he states,

> By avoiding filter questions, the Matthews "Perception" Survey simply assumed
> that participants spontaneously formed an opinion about the type of ingredients—
> classified along a 'natural' versus 'synthetic' dichotomy – that a multivitamin
> contains. Nor does including 'Don't know', 'Other,' or 'Does not communicate any
> information' answer choices suffice to alleviate the one-sided bias induced by the
> leading question. Contrary to Dr. Matthews's claim, such a 'quasi-filter' question
> is nevertheless leading and would lead to overreporting of opinions, because the
> question itself already inserts in participants' minds certain concepts—types of
> ingredients and a binary categorization of 'natural' versus 'synthetic' ingredients—
> that may have otherwise never occurred to some participants.

Kivetz Report ¶ 148

161.    I did not avoid including a filter question. If Dr. Kivetz chooses to argue with

Professor Diamond's (2011) Reference Guide on Survey Research, which states (as previously

quoted) that using a quasi-filter question is a scientifically sound methodology, then Dr. Kivetz is

welcome to do so. I, however, agree with Dr. Diamond's position.

## XV.  CONCLUSIONS

162.    Our surveys followed academic and scientific best practices, which yielded high

quality results that present accurate, precise estimates of what is true in the larger consumer

population. We have evidence to support the position that the word "natural" impacts consumers'

perceptions of the ingredients contained in the Product, but I was specifically instructed by defense

counsel not to talk about this evidence in my deposition. The Kivetz Report includes categorically

false statements or debatable conclusions based on the academic literature. We stand by our conclusions as presented in our original report and in this Reply Report that consumers have common, material perception that the challenged "natural" claim on multivitamins, including on the Product labels, mean that those products contain only natural ingredients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/29/2024_____

_____
Lynn Matthews, PhD

## References

Aaker, David A. (2007), *Marketing Research*: Ninth Edition: John Wiley & Sons.

Alvarez, G. A., & Cavanagh, P. (2004). "The capacity of visual short-term memory is set both by visual information load and by number of objects." *Psychological science*, *15*(2), 106-111.

Baddeley, Alan D., Neil Thomson, & Mary Buchanan (1975), "Word length and the structure of short-term memory." *Journal of verbal learning and verbal behavior*, *14*(6), 575-589.

Bradburn, Norman M, Seymour Sudman, and Brian Wansink (2004), *Asking Questions: The Definitive Guide to Questionnaire Design--for Market Research, Political Polls, and Social and Health Questionnaires*: John Wiley & Sons.

Converse, J. M. (1976). Predicting no opinion in the polls. *Public Opinion Quarterly*, *40*(4), 515-530.

Costello, J. P., & Malkoc, S. A. (2022). Why are donors more generous with time than money? The role of perceived control over donations on charitable giving. *Journal of Consumer Research*, *49*(4), 678-696.


Cowan, Nelson (2001), "The magical number 4 in short-term memory: A reconsideration of mental storage capacity," *Behavioral and brain sciences*, *24*(1), 87-114.

Creswell, John W. (2013). *Qualitative Inquiry & Research Design: Choosing Among Five Approaches*: Sage.

Diamond, Shari (2011), Reference Guide on Survey Research. In *Reference Manual on Scientific Evidence*: Third Edition: Federal Judicial Center/National Academy of Sciences.

Diamond, Shari and Jerre B. Swann (2012). *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*: American Bar Association.

Dillman, Don A, Jolene D Smyth, and Leah Melani Christian (2014), *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method*: John Wiley & Sons.

Festinger, L. (1957) *A theory of cognitive dissonance*: Stanford University Press.

Grice, H.P. (1975). Syntax and semantics 3: Speech arts, Cole et al. "Logic and conversation", pp. 41-58.

Han, M., Newman, G. E., Smith, R. K., & Dhar, R. (2021). The curse of the original: How and when heritage branding reduces consumer evaluations of enhanced products. *Journal of Consumer Research*, *48*(4), 709-730.

Harmon-Jones, E., & Mills, Judson (2019). "An Introduction to Cognitive Dissonance Theory and an Overview of Current Perspectives on the Theory," in E. Harmon-Jones (ed.) *Cognitive Dissonance, Second Edition: Reexamining a Pivotal Theory in Psychology*, American Psychological Association (3-24).

Jansen, Harrie (2010). "The Logic of Qualitative Survey Research and its Position in the Field of Social Research Methods," In *Forum Qualitative Sozialforschung/Forum: Qualitative Social Research*, 11(2), article 11.

Kalton, Graham, and Howard Schuman. (1982). "The effect of the question on survey responses: A review." *Journal of the Royal Statistical Society Series A: Statistics in Society* 145(1): 42-57.

Krosnick, J.A., Holbrook, A.L., Berent, M.K., Carson, R.T., Michael Hanemann, W., Kopp, R.J., Cameron Mitchell, R., Presser, S., Ruud, P.A., Kerry Smith, V. and Moody, W.R. (2002). The impact of" no opinion" response options on data quality: non-attitude reduction or an invitation to satisfice?. *Public Opinion Quarterly*, 66(3), pp.371-403.

Merriam, Sharan B. (2009). *Qualitative Research: A Guide to Design and Implementation*: Jossey-Bass, A Wiley Imprint.

Reja, Urša, Katja Lozar Manfreda, Valentina Hlebec, and Vasja Vehovar. (2003). "Open-ended vs. close-ended questions in web questionnaires." *Developments in applied statistics* 19(1): 159-177.

Rifkin, Jacqueline R., Katherine M. Du, and Jonah Berger. "Penny for your preferences: leveraging self-expression to encourage small prosocial gifts." *Journal of Marketing* 85.3 (2021): 204-219.

Schuman, Howard, and Stanley Presser. (1979). "The open and closed question." *American sociological review*, 692-712.

Schuman, H., and Stanley Presser. (1996). *Questions and answers in attitude surveys: Experiments on question form, wording, and context*: Sage.

Schwarz, Norbert, (1999). "Self-reports: How the questions shape the answers." *American psychologist* 54(2): 93.

Shadish, W., Cook, T. D., & Campbell, D. T. (2002). *Experimental and quasi-experimental designs for generalized causal inference* (Vol. 1195). Boston, MA: Houghton Mifflin.

Singer, Eleanor, and Mick P. Couper, (2017). "Some methodological uses of responses to open questions and other verbatim comments in quantitative surveys." *Methods, data, analyses: a journal for quantitative methods and survey methodology (mda)* 11(2): 115-134.

Tourangeau, Roger, Lance J Rips, and Kenneth Rasinski (2000), *The Psychology of Survey Response*: Cambridge University Press.

Young, Rebekah Lynn. (2012). "Don't know responses in survey research." Doctoral dissertation: Pennsylvania State University.

**EXHIBIT A**

Recent Testimony of A. Lynn Matthews, Ph.D.

**Deposition Testimony:**

11/14/2022          Vicki Elder, *et al vs.* Bimbo Bakeries USA, Inc.
                    United States District Court
                    Southern District of Illinois, Eastern Division 3:21-cv-00637-DWD

6/23/2023           Charles Strow, *et al vs.* The J.M. Smucker Company / B&G Foods, Inc.
                    United States District Court
                    Northern District of Illinois, Eastern Division 1:21-cv-05104

8/25/2023           Lacie Davis, *et al vs.* Ricola USA, Inc.
                    United States District Court
                    Central District of Illinois, Springfield Division 3:22-cv-03071

11/16/2023          Kenneth Crawford, *et al vs.* Arizona Beverages USA LLC
                    United States District Court
                    Southern District of Illinois, East St. Louis Division 3:22-cv-00220

2/14/2024           Duval Clemmons, *et al vs.* Upfield US Inc.
                    United States District Court
                    Southern District of New York, Manhattan 1:22-cv-00355-PKC

4/03/2024           Deniece Drake, *et al vs.* Bayer Healthcare LLC
                    United States District Court
                    Southern District of California 3:22-cv-01085-MMA-JLB

4/10/2024           Miguel Frias, et al vs. Mars Wrigley Confectionary US LLC
                    United States District Court
                    Southern District of New York 1:23-cv-04422-AT

04/15/2024          Marie Falcone, et al vs. Nestle USA, Inc.
                    United States District Court
                    Southern District of California San Diego Division 3:19-cv-00723-L

05/09/2024          Lisa Bardsley and Andre Haskett vs. Nonni's Foods LLC
                    United States District Court
                    Southern District of New York 7:20-cv-02979 NSR

05/21/2024          Christina Del Rosario vs. Sazerac Company, Inc.
                    United States District Court
                    Southern District of New York 1:23-cv-01060-AS

**Arbitration and Trial Testimony:**

## EXHIBIT B: Details of Follow-up Study

### A. STUDY METHODOLOGY

Target Population

1.      We slightly modified the sampling procedure in this consumer survey, compared to the one previously discussed. Specifically, as this survey recruited a smaller number of participants than the one previously discussed, we broadened our age quotas to consist of three general categories: ages 18-34, ages 35-54, and ages 55+. This ensured that we obtained a representative distribution of individuals across the age spectrum without placing unduly burdensome restraints on the sampling frame. Otherwise, the sampling procedure and target population remained unchanged from the previous report.

Study Design and Reliability Assessment

2.      We designed our survey experiment following academic and practitioner best practices (Diamond and Swann 2012, Dillman et al. 2014, Shadish et al. 2002), as detailed in the report previously submitted.

3.      In this supplemental survey, the experimental section of the survey tested whether the presence of a label that included the statement "Natural Multivitamin" versus a label that only stated "Multivitamin" without the word "Natural" causes a difference in consumer perceptions of the type of ingredients found in multivitamin dietary supplements.

4.      Respondents were randomly assigned to one of two experimental conditions, as follows.

5.      First, to test consumer perceptions regarding the types of ingredients found in the multivitamin dietary supplement, we included a condition that displayed the word "Natural" on two Multivitamin jars: one with a blue aesthetic and one with an orange aesthetic to reflect the general color scheme of the Product as it is presented in the marketplace. The label was designed

based on the original Product labels tested but removed all label attributes except the basic color scheme and the claim "Natural." As such, this set of experimental conditions effectively isolates the impact of the claim "natural" in the context of a multivitamin.

6.      A second condition displayed the same modified two jars of Multivitamins, but removed the word "Natural" from the product label.

7.      In both of these conditions, we asked respondents their perceptions regarding what the product labels were communicating about the ingredients that the multivitamin contained.

8.      Thus, we conducted a 2 ("Natural", not including the word Natural) by 1 full factorial design experiment to assess the impact of removing the word "Natural" from the label of a package labeled "Multivitamin.".

9.      All question wording, along with screenshots of the instrument, are shown in the section titled "Question Wording and Survey Format."

10.     Our design allows us to 1) identify consumer beliefs regarding the meaning of the word "Natural" in a multivitamin context when no other stimuli are present, and 2) test whether removing the word "Natural" from a multivitamin product label impacts consumer beliefs regarding the ingredients contained in a multivitamin product.

11.     We then conducted a pretest of the experiment to ensure that it was technically coded and formatted correctly. As before, we worked closely with the panel provider Qualtrics, who under our direct supervision programmed the survey to ensure that screening questions and quotas would be implemented correctly. The pretest used the same criteria and design as the main survey data collection. Data were collected for the pretest and reviewed, resulting in confirmation that the experiment was indeed programmed correctly. No changes were made to the survey experiment as a result of the pretest, and the pretest data were incorporated into the main dataset.

Data Collection

12.    The survey was fielded from February 13, 2024 through February 26, 2024.

13.    A total of 1281 individuals began the survey.

14.    Of these, 26 were screened out as not being in the target population and 13 were
identified as low quality respondents or bots and removed by Qualtrics' quality assurance team.

15.    In addition, 850 individuals were screened out for entering the survey after relevant
quotas were filled.

16.    After screening out ineligible respondents and incomplete responses, a total of 392
good quality responses remained to be used in analysis.

## B.  QUESTION WORDING AND SURVEY FORMAT

17.    We followed standard methodological procedure (Bradburn et al. 2004, Diamond
and Swann 2012, Dillman et al. 2014, Schuman and Presser 1996, Tourangeau et al. 2000) to
design the order, wording, and response options for our survey questions. We carefully considered
question and response wording and formatting to ensure objectivity and avoid bias. A discussion
of our methods for each question in the instrument that was used in analysis follows.

Introduction

18.    We began the survey with an introduction. Following best practices (Bradburn,
Sudman, & Wansink 2004; Dillman et al. 2014; Tourangeau et al. 2000), the introduction stated
the topic of the study, length, sensitivity of the subject matter, and anonymity of respondents.
Respondents were told that the study was conducting consumer research about various topics, an
accurate statement that would also discourage perceptions that the research was for litigative
purposes. Following Diamond (2011), the study was double-blind in that neither the respondents
nor the panel provider knew the sponsor of the study, to prevent respondents from presenting

opinions that they believed the researchers wanted.

19.    The introduction was worded as follows: "Hello! We are conducting consumer research about various topics. This survey should take about 10 minutes and will not ask any sensitive questions. There are no right or wrong answers and we appreciate your honest opinions. This survey is completely anonymous. Thank you in advance for your help with our research!"

Hello! We are conducting consumer research about various topics. This survey should take about 10 minutes and will not ask any sensitive questions. There are no right or wrong answers and we appreciate your honest opinions. This survey is completely anonymous. Thank you in advance for your help with our research!

Screening Questions

20.    Next, a battery of screening questions was used to ensure that only respondents who were in the target population took the survey. First, we asked respondents how old they were, with categories of Under 18 (screened out), 18-34, 35-54, and 55+, as shown below.

How old are you?

○ Under 18

○ 18 - 34 years old

○ 35-54 years old

○ 55+ years old

21.    We then asked respondents their gender, and screened out non-binary individuals and those who preferred not to reveal their gender.

What is your gender?

- ○ Male
- ○ Female
- ○ Non-binary / third gender
- ○ Prefer not to say

22.    We next asked respondents how they would describe their race and ethnicity through a series of two questions. The first asked if they considered themselves to be Hispanic, and the other asked them to describe their race using the categories used in the US Census.

Do you consider yourself to be Hispanic?

- ○ Yes
- ○ No

How would you describe your race? Please select all that apply.

- ☐ White
- ☐ Black or African American
- ☐ American Indian or Alaska Native
- ☐ Asian
- ☐ Native Hawaiian or Pacific Islander
- ☐ Other (Specify):

[                    ]

23.     We then asked respondents, "In which state or U.S. territory do you live?" with a

dropdown menu giving all 50 states, Washington D.C., Puerto Rico, and "I do not reside in the

United States" as options. Quota sampling was used to ensure that we obtained sufficient responses

from the Midwest, Northeast, South, and Western regions of the US. As with the original report,

individuals who indicated "I do not reside in the United States" were screened out.

In which state or U.S. territory do you live?

24.     We next asked respondents what topics they had taken a survey on in the last 30

days to ensure that individuals who might have taken a survey on a similar topic (vitamins) were

not different in their perceptions of the ingredients in a vitamin supplement.

In the last 30 days, have you taken a survey about any of the following topics? Please select all that apply.

☐ Alcoholic beverages

☐ Non-alcoholic beverages

☐ Cosmetics

☐ Electronics

☐ Fresh or frozen meat

☐ Produce

☐ Travel

☐ Vitamins

☐ None of the above

25.     Next, we asked respondents if they or anyone in their family worked for specific industries to test whether respondents who worked in a given industry were different from others in their perceptions regarding the ingredients in a multivitamin.

Do you or anyone in your family work in the following industries? Please select all that apply.

- [ ] Education
- [ ] Healthcare
- [ ] Grocery stores
- [ ] Restaurants
- [ ] Automobiles
- [ ] Insurance
- [ ] Packaged food or beverage products
- [ ] Pharmaceutical products
- [ ] Marketing
- [ ] Marketing Research
- [ ] None of the above

26.     Next, we asked respondents to indicate which product types they had purchased for their own personal use in the last 12 months. Five types of pharmacy related products were included to prevent respondents from guessing that the study was about the product category of vitamin dietary supplements. Only individuals who indicated that they had purchased "vitamin dietary supplements" in the last 12 months were permitted to continue the study; all others were screened out as not being in the target population for the study.

In the last 12 months, which of the following products have you purchased for your own personal use? Please select all that apply.

☐ Hair care products

☐ Over the counter medication (e.g. pain relievers, cough medicine)

☐ Prescription drugs and medications

☐ Skin care products

☐ Vitamin dietary supplements

☐ None of the above

27.    Next, we assessed the frequency of purchase of vitamin dietary supplements for respondents. This control variable allowed us to assess whether purchase frequency of the product category was associated with different preferences and perceptions regarding vitamin dietary supplements.

How often do you typically purchase vitamin dietary supplements for your own personal use?

○ Once a week or more

○ About two to three times a month

○ About once a month

○ A few times a year

○ About once a year

○ Less often than once a year

Distractor Task

28.     We included the same Distractor Test for this supplemental survey as we did for the previously submitted report. The specific question wording and reasons for including a distractor task are similarly included in the original report. The three questions are also copied below.

Now we're going to ask you some questions about a new type of vitamin dietary supplement. This product is not yet for sale. We would appreciate hearing your honest thoughts about this potential product. There are no right or wrong answers, and we thank you in advance for your opinions.

Please imagine that while you were grocery shopping, you came across a new product: First Choice Multivitamin Acai Berry Gummies. The back of the package states, "Start your day with a multivitamin gummy with 12 key nutrients and the benefits of the acai berry superfruit!" How likely or unlikely would you be to purchase this product?

○ Would definitely purchase

○ Would probably purchase

○ Might or might not purchase

○ Would probably not purchase

○ Would definitely not purchase

In general, how much do you like or dislike products that contain acai berries?

○ Like a great deal

○ Like somewhat

○ Neither like nor dislike

○ Dislike somewhat

○ Dislike a great deal

Please indicate the extent to which you agree or disagree with the following statements.

|  | Strongly agree | Somewhat agree | Neither agree nor disagree | Somewhat disagree | Strongly disagree |
|---|---|---|---|---|---|
| Products with acai berries are good for your health. | ○ | ○ | ○ | ○ | ○ |
| Acai berries would provide good flavor for a multivitamin gummy | ○ | ○ | ○ | ○ | ○ |
| Products made with acai berries are too expensive | ○ | ○ | ○ | ○ | ○ |

<u>Ingredients Perceptions</u>

29.    Consumers were next randomly assigned to view one of two scenarios. The two scenarios specifically tested the impact of including the word "Natural" on product labeling for a generic multivitamin not associated with any brand; Condition 1 included the word "Natural" on the product label, while Condition 2 did not.

30.    For this experiment, respondents were asked to imagine in both Conditions that they were shopping for multivitamin dietary supplements and saw the following product on the shelf. They were asked to examine the product label, then to "indicate which of the following statements comes closest to your understanding of what, if anything, the product labels are communicating about the ingredients included in the multivitamin. The product labels indicate that the multivitamin contains…"

31.    Respondents were given the closed-ended answer options of, "Only natural

ingredients," "Both natural and synthetic ingredients," "Only synthetic ingredients," "Other," "Don't know," and "The product label does not communicate any information about the type of ingredients included in the fruit bites multivitamins."

32.     We once again used closed-ended rather than an open-ended question format, as well as the "other," "don't know" or "Not enough information" options, for the same reasons as described in the original report.

33.     In this supplemental report, we have been asked to identify the proportion of respondents who believe that the word "Natural" on a multivitamin product communicates that the multivitamin contains only natural ingredients, and to test the extent to which removing the word "Natural" from a multivitamin product changes consumers' perceptions regarding the ingredients. For the same reasons and using similar methodology to that described in our original report, in our analysis we examine the proportion of individuals who believe that only natural ingredients were used in the product compared to all others who answered the question.

34.     The first condition, which included the word "Natural," is presented below.

Now please imagine that you are shopping for **vitamin dietary supplements** and see the following products on display. Please take a moment to examine the following product labels.



Based on the product labels that you just saw, including the language "NATURAL MULTIVITAMIN," please indicate which of the following statements comes closest to your understanding of what, if anything, the product labels are communicating about the ingredients included in the multivitamin.

The product labels indicate that the multivitamin contains...

○ Only natural ingredients

○ Both natural and synthetic ingredients

○ Only synthetic ingredients

○ Other

○ Don't know

○ The product label does not communicate any information about the type of ingredients included in the multivitamin

35.     In addition, we do not simply report levels of confusion in one condition, but test

whether this amount of confusion differs for a label with the word "Natural" and an edited label that removed the word "Natural." We do so in the same way and for the same reasons as described in the original report. The distinction between this experiment and the experiment described in the report is that this question provides a simplified label that includes no brand information, visual imagery such as fruit, additional claims about the specific product, or any nutrition or dietary information. By isolating the claim presented to the respondents, we are able to measure the impact of the word "Natural" on consumers' perceptions of multivitamins apart from any other stimuli.

Now please imagine that you are shopping for **vitamin dietary supplements** and see the following products on display. Please take a moment to examine the following product labels.



Based on the product labels that you just saw, including the language "MULTIVITAMIN," please indicate which of the following statements comes closest to your understanding of what, if anything, the product labels are communicating about the ingredients included in the multivitamin.

The product labels indicate that the multivitamin contains...

○ Only natural ingredients

○ Both natural and synthetic ingredients

○ Only synthetic ingredients

○ Other

○ Don't know

○ The product label does not communicate any information about the type of ingredients included in the multivitamin

Demographics

36.     After responding to the experimental portion of the survey above, respondents were asked additional demographic questions. These questions were identical to the Demographics questions discussed in the previous report.

## C. ASSESSMENT OF DATA QUALITY

37.     On average, respondents took 279.9 seconds (4.7 minutes) to complete the survey. This is not unduly long or burdensome for online surveys (Dillman et al. 2014). Indeed, respondents who volunteered feedback were largely positive about the survey, with exemplars stating "It was great," "It was an enjoyable survey," and that it consisted of "Very good survey questions." As such, we do not believe that there are significant issues of data quality due to respondent fatigue or disinterest.

38.     For the same reasons as those described in the original report, we calculated a binary variable indicating whether individuals were at less than the 10th percentile of duration (124 seconds) and included it in our multivariate analysis presented above. As such, we control

for the presence of "speeders" in our multivariate analysis and can be confident that our conclusions regarding statistical significance are not adversely impacted by this variable.

39.     Tables of descriptive statistics for survey respondents are as follows. As shown, we obtained a sizable number of respondents for each major demographic group to allow statistical testing to occur, though some smaller demographic groups were under-represented. To account for potential differences in perceptions of our focal variables, we included the demographic variables below in our analysis. We conducted multivariate testing to control for any additive impact of the below demographic variables on consumers' perceptions of the type of ingredients included in the multivitamin.

| Gender | | |
|---|---|---|
| | Frequency | Percent |
| Male (Gender = 0) | 187 | 47.7% |
| Female (Gender = 1) | 205 | 52.3% |
| Total | 392 | 100.0% |

| Age | | |
|---|---|---|
| | Frequency | Percent |
| 18-34 (Age = 2) | 115 | 29.3% |
| 35-54 (Age = 3) | 127 | 32.4% |
| 55+ (Age = 4) | 150 | 38.3% |
| Total | 392 | 100.0% |

| Hispanic | | |
|---|---|---|
| | Frequency | Percent |
| Non-Hispanic (Hisp = 0) | 321 | 81.9 |
| Hispanic (Hisp = 1) | 71 | 18.1 |
| Total | 392 | 100.0 |

| Race | | |
|---|---|---|

|  | Frequency | Percent |
|---|---|---|
| White *(race_w = 1)* | 265 | 67.6% |
| Black *(race_b = 1)* | 50 | 12.8% |
| American Indian *(race_amind = 1)* | 19 | 4.8% |
| Asian *(race_asian = 1)* | 19 | 4.8% |
| Pacific Islander *(race_pi = 1)* | 5 | 1.3% |
| Other *(race_oth = 1)* | 46 | 11.7% |

| Region |  |  |
|---|---|---|
|  | Frequency | Percent |
| Midwest | 75 | 19.1% |
| Northeast | 149 | 38.0 |
| South | 82 | 20.9 |
| West | 86 | 21.9 |
| Total | 392 | 100.0 |

| Frequency of Purchase of Vitamin Dietary Supplements |  |  |
|---|---|---|
|  | Frequency | Percent |
| Less often than once a year *(freqpurch = 0)* | 3 | .8% |
| About once a year *(freqpurch = 1)* | 8 | 2.0% |
| A few times a year *(frequpurch = 3)* | 116 | 29.6% |
| About once a month *(freqpurch = 12)* | 172 | 43.9% |
| About two to three times a month *(freqpurch = 30)* | 42 | 10.7% |
| Once a week or more *(freqpurch = 52)* | 51 | 13.0% |
| Total | 392 | 100.0% |

| Purchased Bayer One a Day Products? | | |
|---|---|---|
| | Frequency | Percent |
| Had not purchased any Bayer One a Day products in past 12 months *(purch_bayer = 0)* | 348 | 88.8% |
| Had purchased at least one Bayer One a Day product in past 12 months *(purch_ bayer = 1)* | 44 | 11.2% |
| Total | 392 | 100.0% |

## D. ASSESSMENT OF RESULTS ACROSS DEMOGRAPHICS

40.    For each of these labels, we also tested whether these results were similar across age group, gender, race, ethnicity, education level, income level, region, industry, whether individuals had taken a survey on the product category in the last 30 days, and people who took a relatively short time (less than 124 seconds, 10th percentile) or relatively long time (greater than 387 seconds, 90th percentile) to complete the survey.

41.    We first ran a logistic regression (Hosmer & Lemeshow 2000) to predict the likelihood of believing that the Product contained only natural ingredients.

42.    We ran this regression on both conditions of respondents who saw the label with the words "Natural Multivitamin" and the label with the word "Multivitamin" only (n=382 due to 10 individuals having missing demographic data).

43.    Our binary input variables included:

i.    Whether respondents were in the edited condition that removed the word "Natural" or not;

ii.    Whether respondents had purchased Bayer products in the last 12 months;

iii.    Whether respondents took a relatively long time to complete the survey (yes, no);

iv.    Whether respondents took a relatively short time to complete the survey (yes, no);

v.    Respondents' race (white, nonwhite);

vi.      Respondents' ethnicity (Hispanic, non-Hispanic);

vii.     Respondents' gender (male, female);

viii.    Geographic region indicators for the Midwest, Northeast, South, and West;

ix.      Industry indicators for marketing (yes, no), marketing research (yes, no), pharmaceutical industry (yes, no), and healthcare (yes, no);

x.       Whether respondents had taken a survey about Vitamins in the last 30 days (yes, no); and

xi.      Whether respondents had seen news about Bayer Corporation in the past 30 days (separate indicators for yes, no, and not sure).

44.     Continuous variables included frequency of purchase within the product category, age, education level, and income.

45.     The results of the logistic regressions are as follows: Individuals who saw the label without the word "Natural" were far less likely to believe that the product only contained natural ingredients (log-odds B = -2.269, p<.001). Similarly, individuals who worked in the pharmaceutical products industry were less likely to believe that the product contained only natural ingredients (log-odds B=-1.792, p < .05). By contrast, individuals who indicated that they "Don't know" if they saw news about Bayer in the last 30 days were more likely to believe that the product contained only natural ingredients (log-odds B= 1.554, p<.05). There were no other statistically significant predictors of belief regarding the type of ingredients in the Product at a p=.05 significance level. This indicates that consumers' beliefs about whether or not the product contains only natural ingredients is similar across demographic variables.

46.    We next applied statistical weighting[3] to our analysis to identify any important differences in the results above if the sample was weighted to match population percentages for gender (male=48%, female=52%), age (18-34: 30%, 35-54: 32%, 55+: 38%), region (Northeast: 17%, Midwest: 21%, West: 24%, South: 38%), race (white: 76.3%, black: 13.4%, Asian or Pacific Islander: 6%, American Indian/Alaskan Native: 1%), and Hispanic ethnicity (Hispanic: 18%, Non-Hispanic: 82%).

47.    Quotas were identified using Qualtrics standard quotas, supplemented with Census 2020 data available at data.census.gov. The percentage of individuals who believed that the Product contained only natural ingredients was similar across the two methods.

---

[3] Per the SPSS Support Manual at www.ibm.com, "A common approach is to compute weight variables for each of the categorical variables for which you want to adjust counts, based on the desired marginal proportions for these categorical variables. SPSS will only use 1 weight variable at a time, so the weight variables are combined by computing their product in a new variable, which is then used as a weight...Logical expressions like (gender=1) return a 1 if true; 0 if false. The ratio by which each of these logical expressions is multiplied reflects the desired percentage divided by the observed percentage. So, 50/60*(gender=1) returns a weight of 50/60=.83333 for gender 1."

**APPENDIX: Demographics and Tables Used in "Natural" Analysis**

## I.    DESCRIPTIVE STATISTICS

### agecat

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 2 | 115 | 29.3 | 29.3 | 29.3 |
| | 3 | 127 | 32.4 | 32.4 | 61.7 |
| | 4 | 150 | 38.3 | 38.3 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### gender

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 187 | 47.7 | 47.7 | 47.7 |
| | 1 | 205 | 52.3 | 52.3 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### hisp

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 321 | 81.9 | 81.9 | 81.9 |
| | 1 | 71 | 18.1 | 18.1 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_w

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 127 | 32.4 | 32.4 | 32.4 |
| | 1 | 265 | 67.6 | 67.6 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_b

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 342 | 87.2 | 87.2 | 87.2 |
| | 1 | 50 | 12.8 | 12.8 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_amind

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 373 | 95.2 | 95.2 | 95.2 |
| | 1 | 19 | 4.8 | 4.8 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_asian

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 373 | 95.2 | 95.2 | 95.2 |
| | 1 | 19 | 4.8 | 4.8 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_pi

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 387 | 98.7 | 98.7 | 98.7 |
| | 1 | 5 | 1.3 | 1.3 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### race_oth

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 346 | 88.3 | 88.3 | 88.3 |
| | 1 | 46 | 11.7 | 11.7 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### score_state

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 | 149 | 38.0 | 38.0 | 38.0 |
| | 2 | 75 | 19.1 | 19.1 | 57.1 |
| | 3 | 82 | 20.9 | 20.9 | 78.1 |
| | 4 | 86 | 21.9 | 21.9 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

*Note: Region northeast=1, midwest=2, south=3, west=4.

### survey_vitamins

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 297 | 75.8 | 75.8 | 75.8 |
| | 1 | 95 | 24.2 | 24.2 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

### ind_health

|       |       | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|-------|-----------|---------|---------------|--------------------|
| Valid | 0     | 341       | 87.0    | 87.0          | 87.0               |
|       | 1     | 51        | 13.0    | 13.0          | 100.0              |
|       | Total | 392       | 100.0   | 100.0         |                    |

### ind_pharm

|       |       | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|-------|-----------|---------|---------------|--------------------|
| Valid | 0     | 380       | 96.9    | 96.9          | 96.9               |
|       | 1     | 12        | 3.1     | 3.1           | 100.0              |
|       | Total | 392       | 100.0   | 100.0         |                    |

### ind_mkt

|       |       | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|-------|-----------|---------|---------------|--------------------|
| Valid | 0     | 380       | 96.9    | 96.9          | 96.9               |
|       | 1     | 12        | 3.1     | 3.1           | 100.0              |
|       | Total | 392       | 100.0   | 100.0         |                    |

### ind_mr

|       |       | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|-------|-----------|---------|---------------|--------------------|
| Valid | 0     | 387       | 98.7    | 98.7          | 98.7               |
|       | 1     | 5         | 1.3     | 1.3           | 100.0              |
|       | Total | 392       | 100.0   | 100.0         |                    |

**freqpurch**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 3 | .8 | .8 | .8 |
| | 1 | 8 | 2.0 | 2.0 | 2.8 |
| | 3 | 116 | 29.6 | 29.6 | 32.4 |
| | 12 | 172 | 43.9 | 43.9 | 76.3 |
| | 30 | 42 | 10.7 | 10.7 | 87.0 |
| | 52 | 51 | 13.0 | 13.0 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

**purch_bayer**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 348 | 88.8 | 88.8 | 88.8 |
| | 1 | 44 | 11.2 | 11.2 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

**news**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 0 | 339 | 86.5 | 86.5 | 86.5 |
| | 1 | 41 | 10.5 | 10.5 | 96.9 |
| | 99 | 12 | 3.1 | 3.1 | 100.0 |
| | Total | 392 | 100.0 | 100.0 | |

**Consumer Beliefs About Ingredients**

*Product label stating "Natural"*

"Based on the product labels that you just saw, including the language "NATURAL MULTIVITAMIN," please indicate which of the following statements comes closest to your understanding of what, if anything, the product labels are communicating about the ingredients included in the multivitamin.

The product labels indicate that the multivitamin contains…

    1: Only natural ingredients
    2: Both natural and synthetic ingredients
    3: Only synthetic ingredients
    77: Other
    88: Don't know
    99: The product label does not communicate any information about the type of ingredients included in the multivitamin"

### dec_natural

| | | Frequency | Percent | Valid Percent | Cumulative Percent | Bias | Std. Error | 95% Confidence Interval Lower | Upper |
|---|---|---|---|---|---|---|---|---|---|
| Valid | 1 | 116 | 58.6 | 58.6 | 58.6 | .0 | 3.5 | 51.5 | 65.2 |
| | 2 | 25 | 12.6 | 12.6 | 71.2 | .0 | 2.4 | 8.1 | 17.7 |
| | 3 | 2 | 1.0 | 1.0 | 72.2 | .0 | .7 | .0 | 2.5 |
| | 88 | 7 | 3.5 | 3.5 | 75.8 | .0 | 1.3 | 1.0 | 6.6 |
| | 99 | 48 | 24.2 | 24.2 | 100.0 | .0 | 3.0 | 18.2 | 30.3 |
| | Total | 198 | 100.0 | 100.0 | | .0 | .0 | 100.0 | 100.0 |

a. Unless otherwise noted, bootstrap results are based on 25000 bootstrap samples

*Subsample: Purchasers of Bayer Products*

### dec_natural

| | | Frequency | Percent | Valid Percent | Cumulative Percent | Bias | Std. Error | 95% Confidence Interval Lower | Upper |
|---|---|---|---|---|---|---|---|---|---|
| Valid | 1 | 11 | 52.4 | 52.4 | 52.4 | -.1 | 11.1 | 30.4 | 73.9 |
| | 2 | 6 | 28.6 | 28.6 | 81.0 | .0 | 10.1 | 10.0 | 50.0 |
| | 99 | 4 | 19.0 | 19.0 | 100.0 | .1 | 8.8 | 4.3 | 37.5 |
| | Total | 21 | 100.0 | 100.0 | | .0 | .6 | 100.0 | 100.0 |

a. Unless otherwise noted, bootstrap results are based on 25000 bootstrap samples

**Label Not Stating "Natural"**

*Full Sample*

"Based on the product labels that you just saw, including the language "MULTIVITAMIN," please indicate which of the following statements comes closest to your understanding of what, if anything, the product labels are communicating about the ingredients included in the multivitamin.

The product labels indicate that the multivitamin contains…

      1: Only natural ingredients
      2: Both natural and synthetic ingredients
      3: Only synthetic ingredients
      77: Other
      88: Don't know
      99: The product label does not communicate any information about the type of ingredients

included in the multivitamin""

### dec_edit

| | | Frequency | Percent | Valid Percent | Cumulative Percent | Bootstrap for Percent[a] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Bias | Std. Error | 95% Confidence Interval Lower | 95% Confidence Interval Upper |
| Valid | 1 | 30 | 15.5 | 15.5 | 15.5 | .0 | 2.6 | 10.3 | 20.6 |
| | 2 | 30 | 15.5 | 15.5 | 30.9 | .0 | 2.6 | 10.8 | 20.6 |
| | 3 | 3 | 1.5 | 1.5 | 32.5 | .0 | .9 | .0 | 3.6 |
| | 88 | 5 | 2.6 | 2.6 | 35.1 | .0 | 1.1 | .5 | 5.2 |
| | 99 | 126 | 64.9 | 64.9 | 100.0 | .0 | 3.4 | 58.2 | 71.6 |
| | Total | 194 | 100.0 | 100.0 | | .0 | .0 | 100.0 | 100.0 |

a. Unless otherwise noted, bootstrap results are based on 25000 bootstrap samples

*Subsample: Purchasers of Bayer Products*

**dec_edit**

| | | Frequency | Percent | Valid Percent | Cumulative Percent | Bias | Std. Error | Lower | Upper |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Bootstrap for Percent[a] | | |
| | | | | | | | | 95% Confidence Interval | |
| Valid | 1 | 5 | 21.7 | 21.7 | 21.7 | -.1 | 8.7 | 5.3 | 40.0 |
| | 2 | 6 | 26.1 | 26.1 | 47.8 | .0 | 9.3 | 9.1 | 45.5 |
| | 3 | 1 | 4.3 | 4.3 | 52.2 | .0 | 4.3 | .0 | 14.3 |
| | 88 | 1 | 4.3 | 4.3 | 56.5 | .0 | 4.3 | .0 | 14.3 |
| | 99 | 10 | 43.5 | 43.5 | 100.0 | .0 | 10.6 | 23.1 | 64.7 |
| | Total | 23 | 100.0 | 100.0 | | .0 | .0 | 100.0 | 100.0 |

a. Unless otherwise noted, bootstrap results are based on 25000 bootstrap samples

## II. LOGISTIC REGRESSION

**Case Processing Summary**

| | N | Percent |
|---|---|---|
| Included | 382 | 97.4% |
| Excluded | 10 | 2.6% |
| Total | 392 | 100.0% |

## Tests of Model Effects

| Source | Wald Chi-Square | Type III df | Sig. |
|---|---|---|---|
| (Intercept) | .479 | 1 | .489 |
| race_w | .014 | 1 | .905 |
| hisp | .223 | 1 | .637 |
| purch_bayer | .255 | 1 | .614 |
| gender | .007 | 1 | .932 |
| news | 4.304 | 2 | .116 |
| long | .005 | 1 | .945 |
| short | 3.225 | 1 | .073 |
| conditionedit | 70.138 | 1 | .000 |
| survey_vitamins | .704 | 1 | .401 |
| ind_health | .010 | 1 | .921 |
| ind_pharm | 3.993 | 1 | .046 |
| ind_mkt | 2.545 | 1 | .111 |
| ind_mr | 1.111 | 1 | .292 |
| score_state | 3.134 | 3 | .371 |
| freqpurch | .477 | 1 | .490 |
| agecat | .041 | 2 | .980 |
| ed | .022 | 1 | .882 |
| inc | 1.859 | 1 | .173 |

Dependent Variable: confused

Model: (Intercept), race_w, hisp, purch_bayer, gender, news, long, short, conditionedit, survey_vitamins, ind_health, ind_pharm, ind_mkt, ind_mr, score_state, freqpurch, agecat, ed, inc

**Parameter Estimates**

| Parameter | B | Std. Error | 95% Wald Confidence Interval | | Hypothesis Test | | |
| | | | Lower | Upper | Wald Chi-Square | df | Sig. |
|---|---|---|---|---|---|---|---|
| (Intercept) | .472 | .5592 | -.624 | 1.569 | .714 | 1 | .398 |
| [race_w=1] | -.039 | .3253 | -.677 | .599 | .014 | 1 | .905 |
| [race_w=0] | 0ᵃ | . | . | . | . | . | . |
| [hisp=1] | .195 | .4132 | -.615 | 1.005 | .223 | 1 | .637 |
| [hisp=0] | 0ᵃ | . | . | . | . | . | . |
| [purch_bayer=1] | .207 | .4107 | -.598 | 1.012 | .255 | 1 | .614 |
| [purch_bayer=0] | 0ᵃ | . | . | . | . | . | . |
| [gender=1] | -.022 | .2640 | -.540 | .495 | .007 | 1 | .932 |
| [gender=0] | 0ᵃ | . | . | . | . | . | . |
| [news=99] | 1.554 | .7683 | .049 | 3.060 | 4.093 | 1 | .043 |
| [news=1] | .264 | .4639 | -.645 | 1.173 | .324 | 1 | .570 |
| [news=0] | 0ᵃ | . | . | . | . | . | . |
| [long=1.00] | .028 | .4027 | -.761 | .817 | .005 | 1 | .945 |
| [long=.00] | 0ᵃ | . | . | . | . | . | . |
| [short=1.00] | .911 | .5072 | -.083 | 1.905 | 3.225 | 1 | .073 |
| [short=.00] | 0ᵃ | . | . | . | . | . | . |
| [conditionedit=1.00] | -2.269 | .2709 | -2.800 | -1.738 | 70.138 | 1 | .000 |
| [conditionedit=.00] | 0ᵃ | . | . | . | . | . | . |
| [survey_vitamins=1] | .254 | .3021 | -.339 | .846 | .704 | 1 | .401 |
| [survey_vitamins=0] | 0ᵃ | . | . | . | . | . | . |
| [ind_health=1] | -.040 | .4065 | -.837 | .756 | .010 | 1 | .921 |
| [ind_health=0] | 0ᵃ | . | . | . | . | . | . |
| [ind_pharm=1] | -1.792 | .8970 | -3.551 | -.034 | 3.993 | 1 | .046 |
| [ind_pharm=0] | 0ᵃ | . | . | . | . | . | . |
| [ind_mkt=1] | -2.660 | 1.6673 | -5.928 | .608 | 2.545 | 1 | .111 |
| [ind_mkt=0] | 0ᵃ | . | . | . | . | . | . |
| [ind_mr=1] | 1.748 | 1.6584 | -1.502 | 4.999 | 1.111 | 1 | .292 |
| [ind_mr=0] | 0ᵃ | . | . | . | . | . | . |
| [score_state=4] | -.070 | .3538 | -.763 | .624 | .039 | 1 | .844 |
| [score_state=3] | .333 | .3370 | -.327 | .994 | .977 | 1 | .323 |
| [score_state=2] | -.352 | .3498 | -1.038 | .333 | 1.014 | 1 | .314 |
| [score_state=1] | 0ᵃ | . | . | . | . | . | . |
| freqpurch | .007 | .0098 | -.012 | .026 | .477 | 1 | .490 |
| [agecat=4] | .041 | .3327 | -.611 | .693 | .015 | 1 | .902 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| [agecat=3] | .069 | .3437 | -.605 | .743 | .040 | 1 | .841 |
| [agecat=2] | 0[a] | . | . | . | . | . | . |
| ed | -.014 | .0937 | -.197 | .170 | .022 | 1 | .882 |
| inc | -4.498E-6 | 3.2985E-6 | -1.096E-5 | 1.967E-6 | 1.859 | 1 | .173 |
| (Scale) | 1[b] | | | | | | |

Dependent Variable: confused

Model: (Intercept), race_w, hisp, purch_bayer, gender, news, long, short, conditionedit, survey_vitamins, ind_health, ind_pharm, ind_mkt, ind_mr, score_state, freqpurch, agecat, ed, inc

a. Set to zero because this parameter is redundant.

b. Fixed at the displayed value.