# EXHIBIT 28

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:22-cv-01085-MMA-JLB


DENIECE DRAKE, DEBORAH
BOWLING, individually and on behalf
of all others similarly situated


            Plaintiffs,
V.


BAYER HEALTHCARE, LLC,


            Defendant.
_____



DEPOSITION
OF
ANDREA LYNN MATTHEWS

Thursday, June 6, 2024
1:32 p.m. - 5:03 p.m.

LOCATION: Prevail Testimony Management Platform

```
                                                          Page 2

 1   APPEARANCES:

 2         ON BEHALF OF THE PLAINTIFF:
                REESE LLP
 3              8484 Wilshire Boulevard
                Los Angeles, California 90211
 4              BY: MICHAEL REESE, ESQUIRE
                    CHARLES MOORE, ESQUIRE
 5              212.643.0500

 6         ON BEHALF OF THE DEFENDANT:
                LEHOTSKY KELLER COHN LLP
 7              200 Massachusetts Avenue, NW
                Washington, DC 20001
 8              BY: JONATHAN F. COHN, ESQUIRE
                    SHANNON GRAMMEL, ESQUIRE
 9                  ALEXIS SWARTZ, ESQUIRE
                    JACOB RICHARDS, ESQUIRE
10              512.693.8350

11
     ALSO PRESENT:
12
                Lisa White, Session Manager
13              Takisha Clark, Notary Public

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 107

1  define "natural ingredients," correct?

2      A.   We have still not done a study that asks consumers
3  how they define "natural ingredients." That is correct.

4      Q.   And you still haven't tested how consumers would
5  define "synthetic ingredients," correct?

6      A.   We have still not asked consumers how they would
7  define "synthetic ingredients." That is correct.

8      Q.   And -- and you still don't know if consumers even
9  understand what a synthetic ingredient is, right?

10     A.   We did not do a study on that topic.

11     Q.   And consumers' understanding of those terms may vary
12  from consumer to consumer, correct?

13     A.   They might.

14     Q.   It may depend upon the consumer, right?

15     A.   It might.

16     Q.   It may depend upon the context, right?

17     A.   It might.

18     Q.   It may depend on the other words on the label,
19  correct?

20          MR. REESE: Objection to form. Calls for speculation.

21  BY MR. COHN:

22     Q.   You're an expert. You can answer the question.

23     A.   It might. I do think it is very important to note
24  that the only difference in -- the only big difference in the
25  percentage of consumers who believe that the product contained

1  only natural ingredients, it's all the same across the Bayer
2  label, across all the conditions, and then it drops hugely for
3  the generic one that doesn't say "natural." But the one -- the
4  generic that does only say "natural" has almost exactly the same
5  percentage of people who believe that it says "only natural
6  ingredients."
7  　　　　So in terms of context differences, it's remarkable that,
8  actually, it's so incredibly consistent for the generic label
9  that only says "natural multivitamin" to have that consistent a
10 level of consumers who believe that it contains only natural
11 ingredients, and then it just drops drastically, down to less
12 than 16 percent, for the one that only says "multivitamins."
13 　　　　So in terms of how do consumers define it differently,
14 well, we don't know. But there -- it seems to be a very
15 consistent level of people saying "only natural ingredients"
16 across the generic natural vitamin as well as all the Bayer
17 contexts.
18 　　　Q.　That's utterly unresponsive to my question, but
19 thank you for bringing that up. So you have --
20 　　　　　MR. REESE: Objection. Argumentative.
21 BY MR. COHN:
22 　　　Q.　So you have the test group on the generic label
23 study, correct?
24 　　　A.　Yes.
25 　　　Q.　And they have the phrase "natural multivitamins,"

1      A.      Correct.

2      Q.      And different imagery, correct?

3      A.      Correct.

4      Q.      And the percentage of people who thought that
5  product contained only natural ingredients, that control
6  product, that number was the same compared to the test group or
7  the generic label, correct?

8      A.      It was similar.

9      Q.      It was similar. And again, the control group on the
10 Bayer label didn't have the word "natural," right?

11     A.      Correct.

12     Q.      So, if I hear you correctly, what you're suggesting
13 is the other words, the other contextual cues on that label in
14 the original survey, as an aggregate, have roughly the same
15 impact as the word "natural" on the generic label. Am I hearing
16 you correctly?

17     A.      That is precisely what my hypothesis is. Yes.

18     Q.      Okay. And those other contextual cues are not at
19 issue in this litigation, correct?

20     A.      That is what I understand.

21             MR. REESE: Objection to form. Calls for a legal
22     conclusion.

23 BY MR. COHN:

24     Q.      Plaintiffs, to your knowledge, are not challenging
25 those other contextual cues in this litigation, correct?

Page 111

1          MR. REESE: Objection to form. Calls for a legal
2     conclusion.
3          THE DEPONENT: That is my understanding.
4     BY MR. COHN:
5          Q.   The plaintiffs have not asked you -- as one of your
6     many assignments, the plaintiffs have not asked you to assess
7     the impact, if any, of any of those contextual cues, correct?
8          MR. REESE: Objection to form.
9          THE DEPONENT: Correct, and thus, we did not.
10    BY MR. COHN:
11         Q.   You didn't test those contextual cues either in
12    isolation or in the aggregate, correct?
13         MR. REESE: Same objection.
14         THE DEPONENT: We did not conduct statistical tests of them
15    in aggregate. I believe it is likely that if -- given that the
16    generic version, natural versus control, if we were to test that
17    control to the Bayer-level control, that that would also have a
18    statistically significant difference, and that would be a test
19    of the aggregate control conditions on consumers' beliefs. But I
20    have not been asked to run that analysis, and I have not done
21    so.
22    BY MR. COHN:
23         Q.   That's not one of your assignments, right?
24         A.   It was not.
25         Q.   Based upon your surveys, though, if I understand you

Page 112

1  correctly, you're saying that the impact in the aggregate of
2  those other contextual cues, which are not at issue in this
3  litigation, have the same impact as the word "natural" in the
4  generic study, correct?
5       A.   That is what it appears to be. That is a reasonable
6  working hypothesis.
7       Q.   And again, going back to the control in the original
8  study, that control doesn't have the word "natural" on it,
9  correct?
10      A.   That is correct.
11      Q.   And then, when you tested the impact, if any, of the
12 word "natural" on that Bayer label, the answer was there's no
13 statistically significant impact, correct?
14      A.   That is correct. What we would therefore be
15 hypothesizing is a negative interaction effect between the word
16 "natural" and all of the other context cues, such that the word
17 "natural" has meaning, the other contextual cues have meaning,
18 and when they are all together, the word "natural" does not have
19 additional context cues -- or does not have additional meaning
20 beyond what the context cues are already there and staying, and
21 so there was no additional meaning found, no additional change
22 in consumer perception. That would be my hypothesis that could
23 be tested.
24      Q.   Let's use the plain English words that you used in
25 the last deposition, right? Looking at the Bayer label, given

1    A.    I have not tested that.

2    Q.    Same with the phrase "no GMOs." You're not saying

3  that's confusing, right?

4    A.    I have not tested that.

5    Q.    Now, getting back to context, all those words are

6  part of the context in the Bayer label, correct?

7    A.    They are.

8    Q.    All those words can possibly affect a consumer's

9  understanding of the label, correct?

10   A.    It's possible.

11   Q.    And consumers' -- and consumers' understanding of

12  the word "natural," correct?

13   A.    It's possible. But again, given the similarity of

14  the findings between the generic study and the Bayer study, that

15  lends evidence against the thought that conceptual cues --

16  excuse me -- led consumers to perceive that the word -- that the

17  -- that there were differences in ingredients based on the word

18  "natural." Sorry. I --

19   Q.    Well, that's [inaudible] --

20   A.    -- I misspoke.

21   Q.    -- right? Yes.

22   A.    I'm sorry. I misspoke. Your question was regarding

23  the definition of the word "natural" and whether that is based

24  on context cues. It appears that there is very little, minimal

25  difference in the percentage of consumers who perceived that the

Page 117

1  product only contained natural ingredients whether or not the
2  context cues were there, which would indicate that their
3  definition of the word "natural," if we're looking at that as
4  saying it only contains natural ingredients, it looks like
5  empirically, we have evidence that that is actually not very
6  different.
7       Q.   Actually, it's the exact opposite, right? Because
8  you have the control group in the original study, which doesn't
9  have the word "natural," right?
10          MR. REESE: Objection. Argumentative.
11 BY MR. COHN:
12      Q.   You can answer, Doctor.
13      A.   If there is a study that has the word "natural" and
14 no context cues, and it finds similar results to a study that
15 has the word "natural" and context cues, then one can also
16 conclude that the context cues do not appear to impact
17 consumers' perceptions of the word "natural" by itself or with
18 other context cues.
19      Q.   Actually, I -- I think that's the opposite of what
20 you were saying before. So you have the original study --
21          MR. REESE: Object to form. Argumentative. Badgering
22      the witness at this point.
23          MR. COHN: Clearly not. The record can speak for
24          itself.
25 BY MR. COHN:

Page 118

1  Q.  But, Dr. Matthews, you have the original study. The
2  control group doesn't have the word "natural" on it, right?
3  A.  Correct.
4  Q.  It has context cues, correct?
5  A.  Correct.
6  Q.  And now you have the test group on the generic
7  study, correct?
8  A.  Correct.
9  Q.  And that has the word "natural," right?
10  A.  Yes.
11  Q.  But it has no context cues, correct?
12  A.  Correct.
13  Q.  And the results are kind of the same, correct?
14  A.  Correct.
15  Q.  So the context cues have an impact on consumers'
16  understanding, correct?
17  A.  I see what you're saying. The context cues in
18  themselves have an impact on consumer understanding of whether
19  the product contains only natural ingredients.
20  Q.  Correct.
21  A.  That is similar to the impact of the word "natural"
22  by itself, apart from context cues, on whether or not consumers
23  perceive that the product contains natural ingredients, which is
24  also similar to the effect of when consumers see both "natural"
25  and all the context cues on their perceptions of whether it

Page 119

1   contains only natural ingredients.
2       Q.   Fifty-four plus zero is still 54, correct?
3       A.   That mathematical statement is accurate.
4       Q.   Great. Okay. But let's go shifting -- this case
5   again. Based upon what you just said about the studies and the
6   context cues, you would agree that those context cues affect a
7   consumer's understanding of the phrase "natural ingredients,"
8   correct?
9       A.   If we're talking about the answer options of saying
10  it contains only natural ingredients, then it appears that the
11  context cues were likely a source of consumers answering whether
12  or not they thought it contained only natural ingredients, both
13  natural and synthetic ingredients, or only synthetic
14  ingredients.
15      Q.   In other words, those context cues affect a
16  consumer's understanding of the phrase "natural ingredient,"
17  correct?
18      A.   I don't know whether it impacts their interpretation
19  of what that phrase means or whether it's just that the phrase
20  reflects their perceptions of what's true about the label.
21      Q.   And you didn't -- so you're saying you didn't test
22  it. The context cues could affect the consumers' understanding
23  of the phrase "natural ingredients," but you haven't tested it.
24  Is that your testimony?
25      MR. REESE: Objection to form. Misstates the record.

Page 120

1          THE DEPONENT: Sorry. I'm feeling a little bit
2     confused, and I'm trying to answer your questions in the
3     best and most precise way possible, so bear with me while
4     I try to gather my thoughts.
5          We did not test using, for instance, an open-ended
6     question saying, "What do you perceive 'natural
7     ingredients' to be?" We did not test using, say, an
8     open-ended question, "Here's the word 'natural.' Tell me
9     in an essay what you think that means." We did have
10    properly designed, properly implemented, closed-ended
11    question options designed to allow consumers to --
12    whatever they thought the label meant, whatever they
13    thought the context cues meant, whatever they thought the
14    word "natural" meant  -- to then have an accurate answer
15    that reflected their accurate perceptions of what was true
16    about the label's ingredients. That means that some of
17    them, generally a majority of them, thought that the label
18    meant that the product contained only natural ingredients.
19    Those perceptions were driven by the context cues in some
20    cases, by the word "natural" in some cases, especially in
21    the generic survey. Could have been driven by both. Could
22    have been driven by preconceptions about vitamins in
23    general.
24         That is different from saying that consumers'
25    perceptions of what the word "natural" means was different

Page 121

1           based on whether or not they saw context cues, because we
2           find -- well, we did not test whether consumers would
3           open-endedly define "natural" differently based on what
4           label they saw. That wasn't our research question. Our
5           research question was to say, "What percentage of people
6           who saw each version believed that the product only
7           contained natural ingredients?" Does that answer your
8           question?
9    BY MR. COHN:
10        Q.   Not entirely. Let me just try to see if we do
11   understand each other. You didn't test specifically how
12   consumers understand the phrase "natural ingredients," correct?
13        A.   We did not specifically run a definition study.
14        Q.   And you don't --
15           MR. REESE: Objection. And [inaudible] -- object to
16           form. There's -- I mean, "natural ingredients" is not a
17           phrase that's on the label.
18           MR. COHN: Thank you, Michael.
19           MR. REESE: Yeah.
20           MR. COHN: So --
21           MR. REESE: You're welcome.
22           MR. COHN: Anytime. So --
23           MR. REESE: Same here.
24   BY MR. COHN:
25        Q.   You -- you don't know, then, right? It is possible

Page 123

1  survey, correct?

2      A.    One of the answer options to the closed-ended

3  question is "only natural ingredients."

4      Q.    All right. And would you agree that context cues

5  could affect a consumer's understanding of the phrase "natural

6  ingredients"?

7           MR. REESE: Objection to form.

8           THE DEPONENT: It is possible, but my hypothesis is

9      that it would be unlikely.

10 BY MR. COHN:

11     Q.    Have you tested the hypothesis?

12     A.    Not specifically.

13     Q.    Have you tested it generally?

14     A.    The fact that we find similar percentages of

15 consumers who believe that the product contains natural

16 ingredients when they just see a label that says "natural

17 multivitamins," and a label that says "natural" -- or "Natural

18 Fruit Bites multivitamins" with lots of context cues, and a

19 label that has lots of context cues but not the word "natural,"

20 and that we find convergent results over the three of those --

21 that is not specific, but that is general evidence that would

22 suggest -- that would suggest that hypothesis to me as being a

23 possible one.

24     Q.    Now, in your control, in the original survey, the

25 Bayer label, the word "natural" does not appear at all, correct?

Page 124

1              MR. REESE: Objection to form. Asked and answered
2       over a dozen times.
3   BY MR. COHN:
4       Q.     You can answer again.
5       A.     Correct.
6       Q.     But you have the context cues, correct?
7       A.     Yes.
8              MR. REESE: Object --
9   BY MR. COHN:
10      Q.     And those context cues, in your view, are doing the
11  work, roughly speaking, of the word "natural" in the generic
12  label, correct?
13      A.     That is my hypothesis.
14      Q.     So the context cues have an impact on consumers'
15  understanding of whether the ingredients in the product are
16  natural, correct?
17      A.     On their understanding of whether the ingredients in
18  the product are natural, yes.
19      Q.     Thank you. The context cues have an impact on
20  "natural ingredients" in the responses you got in your survey,
21  correct?
22      A.     It is a reasonable hypothesis that the contextual
23  cues lead consumers in a similar percentage to believe that the
24  product only contains natural ingredients to the generic -- to a
25  different stimulus that only has the words "natural" and

Page 125

1  "multivitamin" in it.

2  Q.   And that percentage is a little bit over 50 percent,
3  correct?

4  A.   Depending on what -- so in the generic one, I'll
5  have to check that. I think it was, like, 58.6 in the generic.

6  Q.   And then, for the Bayer control, it was somewhere
7  [inaudible], correct?

8  A.   Let me check for you. Let me check for you. In the
9  Bayer control label A, it was 58.9 percent, so yes, very similar
10 to 58.6. Label B was 56.3. Again, very similar to 58.6.

11 Q.   And you're talking about the control in the original
12 survey, correct?

13 A.   Double-check that, but I believe so. Yes. That is
14 the edited version of label A that removed the word "natural."
15 This is paragraph 35 in my original report. 58.9 percent of
16 consumers of vitamin dietary supplements indicated they believed
17 the product contained only natural ingredients. When shown an
18 edited version of label B that removed the word "natural," 56.3
19 percent of consumers of vitamin dietary supplements indicated
20 they believed that the product contained only natural
21 ingredients.

22 Q.   To be clear, that control label doesn't have the
23 word "natural" on it, correct?

24 A.   Yes. Both of them said "when shown an edited version
25 of label A or label B that removed the word 'natural.'"

Page 126

1    Q.   And then, for the test, when you add back the word
2  "natural," that does not have a statistically significant impact
3  on consumers' understanding of the type of ingredients in the
4  product, right?
5    A.   Correct. 55.6 percent of consumers who viewed label
6  A believed it contained only natural ingredients, and 60.4
7  percent of consumers who viewed label B thought that it
8  contained only natural ingredients. So, in the original Bayer
9  label conditions, we have results ranging from 55.6, 56.3, 58.9,
10 and 60.4. In the generic survey, that -- the "natural"
11 condition, again, was 58.6, which is compared to the edited
12 condition that took out the "natural" claim, and the percentage
13 of people who believed that the product only contained natural
14 ingredients was 15.5. One-five-point-five. So we see, of these
15 four conditions, three of these things on -- my three-year-old
16 likes Sesame Street. "One of these things is not like the other.
17 One of these things is not quite the same." We have four label
18 conditions in the Bayer, one in the generic. They're all between
19 that 55 and 60, and then we have one that's under 16.
20   Q.   Dr. Matthews, you previously testified that there
21 are likely many consumers who might consider something natural,
22 even though there's a chemical process. Do you remember that?
23        MR. REESE: Objection to form.
24        THE DEPONENT: I did.
25 BY MR. COHN: